665 So.2d 802 (1995)
Lowell STOCKSTILL
v.
C.F. INDUSTRIES, INC., et al.
No. CA 94 2072.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
Writ Denied March 15, 1996.
*807 Joseph Race, New Orleans, for plaintiff/appellee, Lowell Stockstill.
Jerald Album, New Orleans, for defendant/appellant, C.F. Industries.
Joseph W. Looney, Tyson B. Shofstahl, New Orleans, for defendant/appellee, Scaffold Builders.
Thomas M. Bergstedt, Gregory P. Marceaux, Lake Charles, for third-party defendant/appellee, Hartford Steam Boilers.
Before LeBLANC, WHIPPLE and FOGG, JJ.
WHIPPLE, Judge.
This is an appeal by C.F. Industries, Inc. ("C.F.") from a judgment in favor of plaintiff, Lowell Stockstill, and against C.F. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On April 11, 1990, C.F. contracted with The Hartford Steam Boiler Inspection and Fire Insurance Company ("Hartford") for *808 the inspection of an ammonia storage tank at C.F.'s Donaldsonville plant site. Hartford, in turn, subcontracted with NDT, Unlimited ("NDT") for the performance of the inspection services. Plaintiff, Lowell Stockstill, was employed by NDT as a level two inspector technician. On this particular job, plaintiff's duties included the performance of wet fluorescent mag particle testing on the shell of the tank to determine the integrity of the shell.
C.F. also contracted with Scaffold Builders, Inc. ("Scaffold Builders") to provide scaffolding for the work to be performed. The two Sky Climber scaffolding units provided and assembled by Scaffold Builders were used by the NDT employees to inspect the walls of the tank, which were approximately 110 to 120 feet high. Each scaffolding was suspended from cables and was moved up and down by electrical hoists on either end of the scaffolding.
Because the tank did not have permanent lighting, C.F. installed portable lighting in the tank for use both by NDT personnel performing the inspection of the tank and by maintenance personnel who were cleaning an oily substance off the floor of the tank. The portable lighting provided by C.F. included two hand-held floodlights, two hand-held spotlights and two large spotlights.
C.F. also supplied electricity for the operation of the lighting and scaffolding. The system set up by C.F. to supply the tank with electricity included a transformer and a circuit breaker box. Each circuit breaker was connected to a ground fault interrupter, and each ground fault interrupter had several plug connections with 200 foot extension cords leading into the tank.
The NDT personnel began the inspection work in the tank on or about Wednesday, April 25, 1990. During the first few days of the project, the workers experienced problems with electrical power outages. Apparently, rainy weather was causing the ground fault interrupters to trip, resulting in power outages. On several occasions, these power outages prevented the NDT employees from operating the hoists on the scaffolding equipment, thus resulting in the scaffolding becoming stuck in a fixed position. In an attempt to correct the problem, C.F. personnel taped the electrical connections to waterproof them and built a temporary shelter over the circuit breaker box. Also, use of one of the two large spotlights was discontinued to prevent an electrical overload. Although the problem with electrical power outages was more prevalent at the beginning of the job, this problem continued throughout the job.
On Sunday, April 29, 1990, plaintiff and a co-employee, Keith Lyons, were using one of the Sky Climber scaffolds to perform testing on the walls of the tank. When they attempted to lower the scaffold, only one of the two hoists was operating. Thus, one end of the scaffold could be lowered, but the other could not. In an attempt to correct the problem, plaintiff and Lyons inched the scaffold upward and would then try to lower it again. On each attempt, the scaffold moved up higher, but could not be lowered. Plaintiff and Lyons called for assistance, and the NDT supervisor, a C.F. supervisor, and a Scaffold Builders technician discussed possible solutions with plaintiff and Lyons.
A decision was made that plaintiff and Lyons would disembark from the scaffolding to allow the Scaffold Builders personnel to work on the scaffolding. The end of the scaffolding with the functioning hoist was lowered to approximately four feet above the ground, such that the scaffold was tilted at an angle toward the ground. According to plaintiff, as the functioning end of the scaffold was lowered, the lighting within the tank began to dim, and by the time he reached the lower end of the scaffold to disembark, it was dark in the tank.
Lyons also testified that a light that had been pointed toward the scaffolding was turned in another direction before they attempted to disembark, and when he got off of the scaffolding, the tank was dark. Lyons stated that he had difficulty seeing the floor as he got off the scaffolding, and he really had to "strain" to see it. Lyons was able to safely disembark from the scaffolding; however, when plaintiff attempted to disembark, he misjudged the distance to the ground and landed on his left leg, seriously injuring his knee.
Plaintiff filed suit against C.F. and Scaffold Builders, alleging that he was injured on the *809 job and that these defendants were liable for damages for his resulting injuries, based on theories of negligence and strict liability.[1]
Thereafter, C.F. filed a cross-claim against Scaffold Builders, seeking indemnification pursuant to the terms of an appendix allegedly attached to the purchase order entered into by the parties. C.F. then filed a motion for summary judgment on its cross-claim, averring that judgment should be rendered in its favor, ordering Scaffold Builders to indemnify C.F. against the claims of plaintiff. The motion was denied by the trial court on September 25, 1991.
C.F. also filed a third party demand against Hartford, alleging that Hartford also owed it indemnification against plaintiff's claims, pursuant to the terms of an appendix allegedly attached to the purchase order in effect between the parties. On June 1, 1993, C.F. moved for summary judgment against Hartford, averring that it was entitled to judgment as a matter of law, ordering Hartford to indemnify it against plaintiff's strict liability claims and against plaintiff's negligence claims, provided that C.F. was not found to be solely negligent. By judgment dated August 16, 1993, the trial court rendered partial summary judgment in favor of C.F. and against Hartford, entitling C.F. to complete indemnification from Hartford against plaintiff's negligence claims, unless C.F. was found to be solely negligent. The trial court denied C.F.'s motion for summary judgment on the issue of its entitlement to indemnification from Hartford for the strict liability claims of plaintiff against C.F.
Shortly before the trial in this matter, plaintiff and Scaffold Builders entered into a compromise agreement, and plaintiff proceeded to trial only against C.F. C.F.'s cross-claim against Scaffold Builders was also presented at the trial. Following a four day jury trial, the jury found C.F. to be both negligent and strictly liable, found no liability on the part of Scaffold Builders and assessed fault as follows: 40% to C.F.; 18% to NDT, plaintiff's employer; and 42% to plaintiff. The jury assessed plaintiff's damages at $483,500.00.
With regard to C.F.'s cross-claim against Scaffold Builders, the jury determined that C.F. had not sent to Scaffold Builders the appendix containing the indemnity language on which C.F. relied. The trial court then reapportioned NDT's fault between plaintiff and C.F., in accordance with the dictates of Gauthier v. O'Brien, 618 So.2d 825 (La.1993), and concluded that C.F.'s reapportioned fault was 48.8%.
By judgment dated March 8, 1994, the trial court rendered judgment in favor of plaintiff and against C.F. in the amount of $235,948.00, representing 48.8% of $483,500.00, with legal interest from the date of judicial demand until paid. The judgment also contained a provision dismissing C.F.'s cross-claim against Scaffold Builders with prejudice.
C.F. filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The court denied the motion on April 18, 1994. C.F. then perfected this appeal from the March 8, 1994 judgment and from the April 18, 1994 judgment, denying its motion for judgment notwithstanding the verdict or, alternatively, for new trial. C.F. lists fourteen assignments of error.[2]

EVIDENTIARY AND PROCEDURAL ISSUES

TRIAL COURT'S REFUSAL TO ALLOW C.F. TO AMEND ITS ANSWER (Assignment of Error No. 1)
On August 12, 1993, nineteen days before the scheduled trial date, C.F. filed a motion *810 for leave of court to file a First Amended Answer. Through its amended answer, C.F. sought to assert the affirmative defense of immunity from tort liability by virtue of its status as plaintiff's statutory employer. Although the trial court ordered C.F. to show cause on August 27, 1993, why it should be granted leave to file its amended answer, there is no minute entry indicating that the hearing took place. Moreover, the record before us contains no ruling by the trial court on this issue.
On August 16, 1993, C.F. filed a motion for summary judgment or, in the alternative, a motion in limine to strike plaintiff's claims against it, and the basis for these motions was its assertion of statutory employer status. By order dated that same day, the trial court denied the motions.
C.F. argues that the trial court abused its discretion in denying C.F.'s motion to amend its answer to plead the defense of immunity from tort liability as plaintiff's statutory employer under LSA-R.S. 23:1061. C.F. further argues that the trial court abused its discretion in denying its motion for summary judgment on the issue of statutory immunity.
The defense of immunity from tort liability based on statutory employer status is an affirmative defense. Davis v. Kreutzer, 93-1498 (La.App. 4th Cir. 2/25/94), 633 So.2d 796, 800, writ denied, 94-0733 (La. 5/6/94), 637 So.2d 1050. As an affirmative defense, it must be specifically pled in the defendant's answer. LSA-C.C.P. arts. 1003, 1005. The general purpose in requiring that certain defenses be affirmatively pleaded is to give fair notice of the nature of the defense, and thereby prevent a last minute surprise to the plaintiff. Mashburn Agency, Inc. v. Universal Engineering & Supply, Inc., 451 So.2d 113, 115 (La.App. 3rd Cir.1984). C.F.'s original answer, filed on February 20, 1991, does not assert the affirmative defense of statutory immunity.
Louisiana Code of Civil Procedure article 1151 addresses amendments to the defendant's answer and provides, in pertinent part, as follows:
A defendant may amend his answer once without leave of court at any time within ten days after it has been served. Otherwise, the petition and answer may be amended only by leave of court or by written consent of the adverse party.
Amendment of pleadings should be liberally allowed, provided that the movant is acting in good faith; the amendment is not sought as a delaying tactic; the opponent will not be unduly prejudiced; and trial on the issues will not be unduly delayed. Beard v. Circle K, Incorporated, 554 So.2d 825, 826 (La.App. 1st Cir.1989). The decision as to whether to grant leave to amend or supplement a pleading is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal except where an abuse of discretion has occurred and indicates a possibility of resulting injustice. Premier Bank, National Association v. Robinson, 618 So.2d 1037, 1039 (La.App. 1st Cir.), writ not considered, 619 So.2d 541 (La.1993).
C.F.'s motion to amend its answer was filed two and a half years after its original answer and a mere nineteen days before the scheduled trial date. Clearly, this late attempt to amend shortly before trial raised new affirmative defenses and did not give plaintiff fair notice of the defense. See Jeffries v. Estate of Pruitt, 598 So.2d 379, 386 (La.App. 1st Cir.), writs denied, 599 So.2d 306, 605 So.2d 1124 (La.1992); Mashburn Agency, Inc., 451 So.2d at 115.
We further note that on March 2, 1993, the trial court entered a pre-trial order, in which all parties were required to file all supplemental and amending pleadings within thirty days of the date of the order, i.e., by April 1, 1993. The pre-trial order further provided that all discovery be completed thirty days before trial. The pre-trial order controls the subsequent course of the action. LSA-C.C.P. art. 1551. The trial court is vested with discretion to amend its pre-trial order, but this discretion must be exercised to prevent substantial injustice to the parties who have relied on the pre-trial rulings and structured the preparation and presentation of their cases accordingly. Wells v. Gillette, 620 So.2d 301, 305 (La.App. 4th Cir.), writ denied, 629 So.2d 396 (La.1993); Vernon v. Wade Correctional Institute, 26,053, pp. 5-6 *811 (La.App. 2nd Cir. 8/19/94), 642 So.2d 684, 689. Under the circumstances presented herein, we find no abuse of discretion in the trial court's refusal to allow C.F. to amend its answer after the deadlines for amendment of the pleadings and completion of discovery had passed.
We likewise find no abuse of discretion by the trial court in denying C.F.'s motion for summary judgment and motion in limine, based on the statutory immunity defense.
This assignment of error lacks merit.[3]

"MARY CARTER AGREEMENT" (Assignment of Error No. 3)
In this assignment of error, C.F. argues that this court should declare the settlement agreement between Scaffold Builders and plaintiff, a settlement known as a "Mary Carter agreement," void as contrary to public policy. Alternatively, C.F. contends that the trial court erred in denying C.F.'s request that the jury be advised of all of the terms and conditions of the settlement between Scaffold Builders and plaintiff.
Agreements with a settling defendant who remains a party at the trial and who retains a financial stake in the plaintiff's recovery have been called "Mary Carter agreements" since the 1967 Florida decision of Booth v. Mary Carter Paint Company, 202 So.2d 8 (Fla.Dist.Ct.App.1967), overruled, Dosdourian v. Carsten, 624 So.2d 241 (Fla. 1993). See Rick v. State, through Department of Transportation and Development, 619 So.2d 1149, 1160 (La.App. 1st Cir.1993) (concurring opinion), affirmed in part, reversed in part on other grounds, 93-1776, 93-1784 (La. 1/14/95), 630 So.2d 1271. The settling defendant guarantees the plaintiff a minimum payment, which may be offset in whole or in part by an excess judgment recovered at trial against the non-settling defendant. Further, the settling defendant remains a party to the lawsuit, and is generally required by the agreement to participate at the trial on the plaintiff's behalf. Elbaor v. Smith, 845 S.W.2d 240 (Tex.1992); see also Christopher Vaeth, Annotation, Validity and Effect of "Mary Carter" or Similar Agreement Setting Maximum Liability of One Cotortfeasor and Providing for Reduction or Extinguishment Thereof Relative to Recovery Against Nonagreeing Cotortfeasor, 22 A.L.R.5th 483, 497-498, 500-501 (1994).
Shortly before the trial in this matter, plaintiff and Scaffold Builders entered into a Mary Carter agreement. Pursuant to this compromise agreement, Scaffold Builders paid plaintiff a certain sum of money and agreed to "participate with the plaintiff to try to help him" during the trial. In the event of recovery by plaintiff following trial, Scaffold Builders was to recover twenty-five percent of any sums received by plaintiff. Plaintiff further agreed to hold Scaffold Builders harmless from any claim by C.F. against Scaffold Builders for contractual indemnity.
With regard to C.F.'s contention that the Mary Carter agreement should be declared void, as against public policy, we conclude that this issue is not properly before us, because C.F. did not raise this issue at trial. Issues not submitted to the trial court for decision generally will not be considered by the appellate court on appeal. Uniform Rules-Courts of Appeal, rule 1-3; Roadrunner Motor Rebuilders, Inc. v. Ryan, 603 So.2d 214, 219-220 (La.App. 1st Cir.1992); see also Poirier v. National Union Fire Insurance Company, 517 So.2d 225, 226 (La. App. 1st Cir.1987). At the beginning of trial, counsel for C.F. only requested that an instruction be read to the jury about the terms *812 and legal effects of the Mary Carter agreement. There is nothing in the record before us to show that any party raised the issue, by motion in limine or otherwise, of the validity of such agreements at the trial of this matter. We therefore decline to review this issue on appeal.
C.F. also contends that the trial court erred in denying C.F.'s request that the jury be advised of all of the terms and conditions of the settlement between Scaffold Builders and plaintiff. Prior to selection of the jury, counsel for C.F. requested that the court instruct the jury as to the terms and legal ramifications of this Mary Carter agreement, specifically requesting that the jury be instructed that plaintiff had entered into a compromise agreement with defendant, Scaffold Builders; that as a consequence of the settlement, there had been a realignment of the parties; that plaintiff had agreed to hold Scaffold Builders harmless from any claim by C.F. for contractual indemnity; and that plaintiff had agreed to pay Scaffold Builders twenty-five percent of any money that plaintiff may recover from C.F.
Counsel for Scaffold Builders objected to C.F.'s request for an instruction to the jury disclosing the specific percentage of plaintiff's recovery which plaintiff had agreed to pay back to Scaffold Builders. The trial court granted C.F.'s request in part and concluded that it was permissible to instruct the jury that there had been a realignment of the parties and that Scaffold Builders now had a financial interest in plaintiff's recovery against C.F. However, the trial court denied C.F.'s request in part by refusing to allow disclosure to the jury of the actual percentage of plaintiff's recovery to which Scaffold Builders would be entitled under the agreement.
The trial judge then instructed the parties to agree to a stipulation, in conformity with the court's ruling, to be read to the jury. The stipulation presented to the jury by the trial court was as follows:
Ladies and Gentlemen, we told you earlier that there were two basic ways that you got evidence in the case. One was that you heard witnesses testify. And, two, they had documentary evidence that would be introduced. There is a third way in which evidence is received, and that is by stipulation of counsel. When all of the lawyers get together and agree and stipulate on something, you may then accept that as a fact without further proof. And the counsel for all parties have agreed to the following stipulation.
Scaffold Builders and the plaintiff, Lowell Stockstill, have settled the claim of Mr. Stockstill against Scaffold Builders. Scaffold Builders is now aligned with Mr. Stockstill. As a term of the settlement, Scaffold Builders now has a financial interest in Mr. Stockstill's recovery. When you return your verdict, however, you will still be asked to assign percentage fault to Scaffold Builders, Incorporated, C.F. Industries, Incorporated, NDT, and the plaintiff[,] Lowell Stockstill.
Louisiana Code of Evidence articles 408 and 413 limit the admissibility at trial of evidence pertaining to settlement agreements. Code of Evidence article 408(A) provides, in pertinent part, as follows:
In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, anything of value in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.... This Article does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. (Emphasis added).
Code of Evidence article 413 further provides:
Any amount paid in settlement or by tender shall not be admitted into evidence unless the failure to make a settlement or tender is an issue in the case. (Emphasis added).
Thus, while evidence of compromise is not admissible to prove liability, it may be properly admissible to prove bias of a witness pursuant to LSA-C.E. art. 408. See Lee v. *813 Missouri Pacific Railroad Co., 566 So.2d 1052, 1056 (La.App. 2nd Cir.), writ denied, 569 So.2d 986 (La.1990). However, pursuant to LSA-C.E. art. 413, any amount paid in settlement would not be admissible, even to prove bias. See Ducote v. Commercial Union Insurance Co., 616 So.2d 1366, 1371 (La. App. 3rd Cir.), writ denied, 620 So.2d 877 (La.1993). In reviewing the trial court's instruction to the jury, we are convinced that the jury was adequately apprised of the realignment of Scaffold Builders with plaintiff and the resulting possibility of bias on the part of Scaffold Builders employees.
The terms of the agreement which C.F. requested be disclosed to the jury and which were not included in the instruction read to the jury are that plaintiff had agreed to hold Scaffold Builders harmless from any claim by C.F. for contractual indemnity and that plaintiff had agreed to pay Scaffold Builders twenty-five percent of any money recovered by plaintiff from C.F. C.F. contends it was entitled to admission of this evidence to demonstrate bias or interest. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. LSA-C.E. art. 403. The trial court has great discretion in assessing the probative value of evidence. Hebert v. Angelle, 600 So.2d 832, 836 (La.App. 3rd Cir.), writ denied, 604 So.2d 997 (La.1992). We conclude that disclosure of the specific terms regarding compensation to either party (i.e., the agreement by plaintiff to hold Scaffold Builders harmless from any indemnity claim by C.F. and the actual percentage of plaintiff's recovery to be paid to Scaffold Builders) would invite prejudice which would likely affect the jury's determinations of liability and damages. Thus, we find no abuse of discretion in the trial court's refusal to disclose to the jury the specific terms of the Mary Carter agreement.
This assignment of error lacks merit.

ISSUES PERTAINING TO THE MERITS OF THE MAIN DEMAND

LIABILITY OF C.F. (Assignments of Error Nos. 4 & 5)
Plaintiff sought to recover from C.F. based on theories of negligence and strict liability, and the jury concluded that C.F. was liable to plaintiff under both theories. C.F. contends that the jury's findings that C.F. was strictly liability to plaintiff because of an alleged defect in the portable lighting in the storage tank and that C.F. was negligent are manifestly erroneous. Because we find no manifest error in the jury's conclusion that C.F. was liable to plaintiff for its negligence, we will not address the strict liability theory of recovery.
The owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on its premises and the duty of not exposing such persons to unreasonable risks of injury or harm. Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993). Whether there has been a breach of the duty owed is a question of fact. Mundy, 620 So.2d at 813.
In order for an appellate court to reverse a trial court's factual findings, the court must find from the record that a reasonable factual basis does not exist for the findings of the trial court and that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. The reviewing court must review the record in its entirety to determine whether the trial court's findings are clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882.
In the instant case, the evidence shows that from the beginning of the project, C.F. was experiencing problems with the electrical supply to the tank. In the days immediately preceding the accident, power failures rendered both the scaffolding and the lighting in the tank inoperative. C.F. personnel attempted to correct this problem by taping the electrical connections and constructing a shelter over the breaker box, apparently concluding that the problem was caused, at least in part, by rainy weather. However, C.F. took additional measures to *814 prevent an electrical overload by discontinuing use of one of the two large spotlights in the tank.
While the reduced lighting in the tank did not interfere with the wet fluorescent mag particle testing, which by its very nature requires subdued lighting, Lyons, a co-worker, testified that it produced "blind spots" in the tank where the lighting was not adequate.
The record further reveals there was an oily substance on the floor of the tank, a residue from the ammonia that was pumped out of the tank. Maintenance personnel were in the process of cleaning this substance off the floor of the tank at the same time that NDT personnel were performing testing in the tank. This oily residue made the floor of the tank appear black making it more difficult to discern the level of the floor in the subdued lighting. In fact, on several occasions, NDT personnel had difficulty judging the distance of the scaffold from the floor of the tank.
The record shows that immediately prior to plaintiff's attempt to disembark from the lowered end of the scaffolding, the area of the tank in which he was situated darkened, apparently as a consequence of a maintenance worker relocating one of the small lights remaining in the tank. When plaintiff attempted to disembark from the scaffolding under these conditions, he was unable to judge the distance between the scaffold and the tank floor, and thus landed improperly on his leg or knee, resulting in the injury to his knee.
After reviewing the record in its entirety, we are convinced that it adequately supports the jury's conclusion that the conditions within the tank rendered it unsafe and resulted in an unreasonable risk of injury. We therefore find no error in the jury's conclusion that C.F. was negligent in failing to keep its facility safe from unreasonable risks of injury.

FAULT OF SCAFFOLD BUILDERS, INC. (Assignment of Error No. 7)
In this assignment of error, C.F. contends that the jury was manifestly erroneous in concluding that Scaffold Builders was not at fault in causing plaintiff's accident. The jury concluded that Scaffold Builders was not liable to plaintiff under either negligence or strict liability theories.
In order to find liability on the part of Scaffold Builders under a strict liability theory, the existence of a defect in the scaffolding rendering it unreasonably dangerous would have to be established. Crane v. Exxon Corporation, U.S.A., 613 So.2d 214, 219 (La. App. 1st Cir.1992), writs granted in part, denied in part, 620 So.2d 858 (La.), on remand, 633 So.2d 636 (La.App. 1st Cir.1993). While the record reveals that prior to the accident plaintiff and his co-worker, Lyons, were unable to lower the scaffolding, the record is devoid of any evidence to establish the existence of an actual defect in the scaffolding. The testimony at trial established that once the NDT personnel disembarked from the scaffolding, the Scaffold Builders employees on the job were able to restore the scaffolding to its full function within a short period of time. Moreover, no mechanical testing of any kind was performed on the scaffolding hoist to determine whether a mechanical defect was actually present. Considering the electrical problems being encountered on the job, the possibility of operator error and the lack of evidence to establish any type of mechanical defect, we cannot conclude that the jury's finding that the scaffolding was not defective is manifestly erroneous.
Regarding the jury's finding that Scaffold Builders was not negligent and that such negligence, if any, was not a cause of plaintiff's damages, C.F. contends that these findings are manifestly erroneous because Scaffold Builders failed to supply more knowledgeable employees on the job site to assist with the motor malfunction.
In reviewing findings of fact, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, *815 reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Moreover, as stated above, where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart, 617 So.2d at 883.
According to Michael Holman, C.F.'s chief plant engineer, Scaffold Builders contractually assumed the duty of instructing the NDT personnel on the use of the Sky Climbers Scaffolding provided by Scaffold Builders. Prior to beginning the inspection work, personnel were given a hands-on demonstration of the use of the scaffolding equipment by Ricky Achord, a Scaffold Builders employee.
Holman also testified that Scaffold Builders agreed to have two individuals present on the job site at all times to relocate scaffolding within the tank and to address any problems that arose with the equipment.
However, Achord testified that he and his helper's duties on the job site were strictly to relocate the scaffolding equipment within the tank as needed. He further stated that it was not his responsibility to attempt to diagnose any mechanical problems with the equipment and that his knowledge regarding the operation of the Sky Climber equipment was somewhat limited.
Achord explained that in the event a problem with the scaffolding arose, his duty was to contact one of Scaffold Builder's Sky Climber technicians to have the technician report to the job site to fix the problem. In fact, one of the technicians had been called out to the job site earlier to address a problem with the equipment.
Based on this conflicting evidence as to the responsibilities of the Scaffold Builders employees on the job site, we find no merit in C.F.'s contention that the jury was manifestly erroneous in finding no negligence on the part of Scaffold Builders for allegedly failing to supply more knowledgeable employees on the job site. This assignment of error also lacks merit.

APPROPRIATENESS OF QUANTIFYING AND REAPPORTIONING EMPLOYER FAULT (Assignment of Error Nos. 7 & 8)
In its seventh assignment of error, C.F. contends that the trial court committed manifest error in assigning NDT only 18% fault. In its eighth assignment of error, C.F. contends that the trial court erroneously applied the principles of Gauthier v. O'Brien, 618 So.2d 825 (La.1993), to reapportion the fault of NDT, plaintiff's employer. C.F. contends that LSA-C.C. art. 2324(B) prohibits such a reapportionment inasmuch as plaintiff was assigned a greater degree of fault than C.F.[4]
Recently, in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975, the Supreme Court again addressed quantification of employer fault in tort cases. In Cavalier, the court held that quantification of employer fault is neither necessary nor appropriate under LSA-C.C.P. art. 1812(C)(2), in an action against a third party tortfeasor, overruling its previous holding in Gauthier that such quantification was mandatory.[5]Cavalier, 94-1496 at pp. 9, 11, 657 So.2d at 981, 982.
*816 Thus, applying the principles enunciated in Cavalier, it is necessary to strike that portion of the jury's verdict which erroneously quantified employer fault and assess liability without regard to the employer or to the percentage of fault attributed by the jury to the employer. See Cavalier, 94-1496 at p. 14, 657 So.2d at 984; see also Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La. 1991). Because the jury's verdict erroneously quantified employer fault, we must determine the proportionate degrees of fault of the remaining parties. See Cavalier, 94-1496 at p. 14, 657 So.2d at 984; see also Guidry, 579 So.2d at 954.
The jury apportioned fault to plaintiff at 42% and to C.F. at 40%. Using the ratio approach described in Guidry, 579 So.2d at 954, and cited with approval in Cavalier, 94-1496 at pp. 14-15, 657 So.2d at 984, plaintiff's fault is increased to 51.2%, and C.F.'s fault is increased to 48.8%. In the instant case, this result is the same result reached by the trial court; thus, this assignment of error lacks merit.

APPORTIONMENT OF FAULT (Assignments of Error Nos. 5, 6 & 7)
In these assignments of error, C.F. challenges the jury's apportionment of fault to itself, plaintiff, Scaffold Builders and NDT. Inasmuch as we found no error in the trial court's conclusion that Scaffold Builders was not negligent or strictly liable, no percentage of fault can be assessed against it. Moreover, as stated above, the jury erred in apportioning any fault to NDT. Thus, we must review the apportionment of fault between C.F. and plaintiff only.
The factors to be considered by the trier of fact in apportioning fault include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) the extent of the risk created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985). The allocation of comparative negligence is a factual matter within the discretion of the trier of fact, and this determination will not be disturbed on appeal in the absence of manifest error. Daigle v. Legendre, 619 So.2d 836, 840 (La. App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993).[6]
Although plaintiff's conduct resulted from inadvertence, in that he misjudged the distance between the scaffolding and the tank floor in the dimly lit conditions, there were no extenuating circumstances shown which required plaintiff to proceed in haste. Rather, he could have requested assistance in disembarking from the scaffold, or a ladder which was available on the job site. While it was suggested that he could also have retrieved the flashlight located on the scaffolding, plaintiff explained that he did not believe it was safe to climb back up the inclined scaffolding to search for the flashlight in the dark. However, by failing to request some type of assistance in disembarking from the scaffolding, plaintiff's actions increased the likelihood of his injury.
C.F., on the other hand, was keenly aware of the electrical problems being experienced in the tank in the days before the accident. Rather than supplying another generator to insure sufficient levels of electricity, it opted to discontinue use of one of the two large spotlights in the tank, thus decreasing the availability of lighting in the tank. Moreover, C.F. was aware of the presence of an oily substance on the floor, which made the floor appear black in color. In fact, it had maintenance personnel in the tank, cleaning the residue, and these individuals also needed lighting to perform their job duties. Considering these factors, the magnitude of the risk created by C.F.'s actions in reducing the amount of available lighting in *817 the tank was also great and presented a serious risk of harm to all of the workers involved.
Our review of the testimony and evidence leads us to the conclusion that the jury was not manifestly erroneous in its apportionment of fault between plaintiff and C.F. These assignments of error also lack merit.

QUANTUM (Assignments of Error Nos. 12, 13 & 14)
In these assignments of error, C.F. challenges several elements of the jury's damages award. The discretion vested in the trier of fact in awarding damages is great, even vast. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Before a court of appeal can disturb an award made by the trier of fact, the record must clearly reveal that the trier of fact abused its much discretion in making the award. The initial inquiry must always be directed at whether the award for the particular injuries and their effects upon the particular injured person is a clear abuse of the trier of fact's much discretion. Thibodeaux v. USAA Casualty Insurance Company, 93-2238, p. 8 (La.App. 1st Cir. 11/10/94), 647 So.2d 351, 357.

Pain and Suffering
C.F. contends that the jury's award of $150,000.00 for plaintiff's past, present and future pain and suffering is excessive. Pain and suffering is an element of general damages, and there is no mechanical rule for determining general damages. Rather, the facts and circumstances of each case control. Thibodeaux, 93-2238 at p. 7, 647 So.2d at 356. Factors to be considered in assessing quantum for pain and suffering are severity and duration. Thibodeaux, 93-2238 at p. 8, 647 So.2d at 357.
Moreover, a defendant takes its victim as it finds him and is responsible for all natural and probable consequences of defendant's tortious conduct. Where defendant's negligent action aggravates a preexisting injury or condition, it must compensate the victim for the full extent of his aggravation. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991).
Shortly after the accident in question, plaintiff, who was only thirty years old at the time, was transported to the emergency room of Prevost Hospital in Donaldsonville. X-rays revealed no broken bones, and plaintiff was given a prescription for pain medication. Three days after the accident, plaintiff sought treatment from Dr. J. Lee Leonard, an orthopedic surgeon. Upon examination, Dr. Leonard noted a large amount of swelling within the left knee joint and very limited range of motion of the knee. Dr. Leonard drained 23 cc's of blood from plaintiff's knee through a syringe and diagnosed a tear of the anterior cruciate ligament, as well as a sprain to the medial collateral ligament.
Ultimately, after conservative treatment failed, Dr. Leonard performed surgery on plaintiff's left knee to repair the tear of the anterior cruciate ligament by placing orthopedic screws and hardware in plaintiff's left knee as well as removing a portion of the meniscus on the left side of the knee. The surgery was performed on July 26, 1990, and after being released from the hospital, plaintiff began physical therapy, which he underwent for seven or eight months.
Dr. Leonard released plaintiff from his care on March 13, 1991, advising plaintiff that he could expect to develop arthritis in the left knee and that he should return for continuing care as needed. Dr. Leonard assigned plaintiff a thirty-five percent permanent impairment rating to his left leg, and he attributed about one-half of that impairment rating to the surgery he performed. Dr. Leonard further opined that plaintiff will likely require a total knee replacement at some point in the future.
Plaintiff testified that since the accident, he has been unable to engage in his normal physical activities, such as jogging and playing sports, and is unable to work in his previous occupation. He explained that if he attempts to straighten his knee, it "cracks" and the pain renders him unable to walk by the end of the day. Thus, he walks with a limp, which, in turn, aggravates his back.
*818 Moreover, although plaintiff had previously injured his left knee in 1983 and had undergone surgery as a result of that injury, the record establishes that shortly after the 1983 surgery, plaintiff was able to return to his normal activities, including working as a pipe inspector. Plaintiff testified that the 1983 injury and resulting surgery did not prevent him from performing his job as a pipe inspector, which required squatting, crawling, carrying heavy equipment weighing up to eighty-five pounds and walking on heavy terrain.
The fact that his previous knee injury did not interfere with his job performance was verified by plaintiff's co-worker, Lyons, and his supervisor, David Savoy. Both Lyons and Savoy testified that prior to the accident in question, plaintiff exhibited no difficulty in performing his job. Moreover, Dr. Louis Blanda, the orthopedic surgeon who performed the 1983 surgery, testified that he only saw plaintiff once or twice for his knee following plaintiff's discharge from the hospital.
Plaintiff is a young man who will suffer the effects of this accident for the rest of his life. Considering the medical evidence regarding plaintiff's knee condition, along with plaintiff's testimony concerning the effects of the accident on plaintiff's lifestyle, we cannot conclude that the jury abused its vast discretion in awarding $150,000.00 in pain and suffering. Accordingly, we decline to disturb the award on appeal.

Future Medicals
C.F. contends that plaintiff failed to prove by a preponderance of the evidence that the accident in question and resulting injury to plaintiff's knee resulted in the need for future knee surgery or that plaintiff will actually undergo the future treatment. Thus, C.F. argues that the jury erred in awarding $27,500.00 for future medical expenses.
A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of an injury. The test is whether plaintiff has shown through medical testimony that more probably than not the subsequent medical treatment was necessitated by the trauma suffered in the accident. White v. Longanecker, 93-1122, p. 9 (La.App. 1st Cir. 5/23/94), 637 So.2d 1213, 1218, writ denied, 94-1704 (La. 10/7/94), 644 So.2d 640.
As stated above, Dr. Leonard opined that more probably than not plaintiff will have to undergo a total knee replacement in the future, and attributed the need for this additional surgery to a combination of both of plaintiff's prior knee injuries. Dr. Leonard estimated that in 1993, knee replacement surgery would cost approximately $19,000.00. Dr. Blanda also opined that knee replacement surgery at some point in the future was a "good possibility."
Dr. Leonard also noted that plaintiff may experience problems with the hardware placed in his knee during the most recent surgery. He explained that thin individuals, such as plaintiff, sometimes experience problems with feeling the hardware because of a lack of fatty tissue to insulate the knee. Thus, he anticipates that plaintiff may require surgical removal of the hardware in the future, at an estimated cost of $5,000.00 to $7,500.00. In fact, plaintiff testified that he was experiencing problems with the screws in his knee and had asked Dr. Leonard to remove them.
Considering the foregoing, we find no error in the jury's award of $27,500.00 for future medical expenses, and this award will not be disturbed.

Loss of Future Earning Capacity
C.F. also avers that the jury's award of $225,000.00 for loss of future earning capacity was an abuse of its discretion. Awards of loss of future earning capacity are speculative by nature and cannot be calculated with mathematical certainty. Therefore, the trier of fact necessarily must have much discretion in fixing such awards. Martino v. Sunrall, 619 So.2d 87, 90 (La.App. 1st Cir.), writ denied, 621 So.2d 821 (La.1993).
To establish his damages for loss of earning capacity, plaintiff presented the testimony of Nathaniel Fentress, a rehabilitation counselor. Regarding plaintiff's vocational history, Fentress testified that plaintiff had *819 performed manual labor all of his life and had progressed from a semi-skilled worker to a skilled worker in blue collar trades. Prior to the accident in question, plaintiff had demonstrated an ability to earn $9.00 to $9.50 per hour.
Fentress further noted that the medical restrictions placed on plaintiff prevented him from engaging in manual or heavy labor, as he had customarily done before the accident. Moreover, although plaintiff had obtained his GED following the accident, plaintiff had experienced difficulty with the curriculum in electronic repair in which he had enrolled at a local vocational technical school. Fentress expressed his doubt that plaintiff would be able to successfully complete such a program.
Fentress opined that plaintiff was most probably a candidate to go back to work in an unskilled to semi-skilled, light, sedentary job and that plaintiff could expect to earn minimum wage to $5.00 per hour in this type of work.
C.F. presented the testimony of Glenn Hebert, a vocational rehabilitation specialist. Hebert performed a labor market survey in May of 1991, which revealed several minimum wage jobs Hebert believed plaintiff could perform. Shortly before trial, he performed another labor market survey, indicating the availability of jobs with wage rates of minimum wage to $6.00 per hour.
However, Hebert also opined that plaintiff would be well suited to complete a course of instruction in electronics or computer-aided drafting, which he felt could give plaintiff a wage earning capacity of $10.00 to $12.00 per hour. Hebert was aware that plaintiff had dropped out of an electronics program, but he thought this was due to excessive absences, rather than plaintiff's inability to handle the course work.
Plaintiff also presented the testimony of Melville Wolfson, a forensic economist, who estimated plaintiff's loss of earning capacity. Dr. Wolfson estimated plaintiff's loss of future earnings to be $282,176.00, assuming that plaintiff was able to earn minimum wage and had a work life expectancy of twenty-six years. Wolfson explained that he utilized plaintiff's earnings in the year preceding the accident, adjusted by an anticipated rate of increase between the time of the accident and the time of trial, as plaintiff's base income. Wolfson further stated that his calculation took into account anticipated future increases in both plaintiff's base income and in the minimum wage rate.
C.F., on the other hand, presented the testimony of Dr. Kenneth Boudreaux, a forensic economist. Dr. Boudreaux calculated plaintiff's loss of future earning capacity to be $76,384.00, assuming that plaintiff could earn minimum wage and that he had a work life expectancy of 23.85 years. In addition to using a shorter work life expectancy, Boudreaux also averaged plaintiff's earnings for the two years preceding the accident to arrive at plaintiff's base income and factored in a slower rate of future increase in that base income.
Faced with these conflicting theories and calculations, the jury awarded plaintiff $225,000.00 in loss of future earning capacity, a figure somewhat lower than the sum calculated by Dr. Wolfson and substantially higher than the sum suggested by Dr. Boudreaux. Where there is a difference in opinion between experts on a factual matter, it is within the trier of fact's discretion to favor one opinion over another. McDonald v. Illinois Central Gulf Railroad Company, 546 So.2d 1287, 1295 (La.App. 1st Cir.), writs denied, 551 So.2d 1340 (La.1989). Considering the conflicting opinions of the economics experts, as well as the record as a whole, we cannot say that the jury abused its much discretion in fixing this award. This assignment of error also lacks merit.

C.F.'S CROSS-CLAIM (Assignment of Error No. 9)
Regarding its cross-claim for indemnity against Scaffold Builders, the indemnity language upon which C.F. relies is contained in an Appendix of Terms and Conditions, which C.F. avers was attached to the purchase order delivered by C.F. to Scaffold Builders. However, as set forth in the verdict form, the jury concluded that C.F. failed to prove by a preponderance of the evidence that the Appendix containing the indemnity language was sent to Scaffold Builders by C.F., a *820 finding with C.F. avers is manifestly erroneous.
Whether parties have entered into an indemnity agreement is a factual question. See Twin City Pontiac, Inc. v. Pickett, 588 So.2d 1125, 1127 (La.App. 2nd Cir.1991). Consent of the parties is necessary to form a valid contract. Where there is no meeting of the minds between the parties, a contract is void for lack of consent. Howell v. Rhoades, 547 So.2d 1087, 1089 (La.App. 1st Cir.1989). Once the contract is complete, it is not subject to further modification by either party without the consent of the other. Woods v. Morgan City Lions Club, 588 So.2d 1196, 1200 (La.App. 1st Cir. 1991). Thus, where there is no agreement to an addendum to a signed contract, the addendum or amendment is void for lack of consent.
The question of whether the addendum containing the indemnity provision at issue was actually attached to the purchase order and sent to Scaffold Builders is clearly a question of fact. As a reviewing court, we may not reverse a factual finding of the jury unless it is clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. Moreover, where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart, 617 So.2d at 883.
Scott Thibodeaux was the employee of Scaffold Builders who actually signed the purchase order between C.F. and Scaffold Builders at issue. Thibodeaux testified that he never received a copy of the Appendix of Terms and Conditions, containing the indemnity provision upon which C.F. relies. Thibodeaux explained that he only received a copy of the purchase order from C.F., which he was authorized to sign without further approval.
On the other hand, George Bagala, a purchasing agent for C.F., testified that it was his practice to attach the Appendix of Terms and Conditions to the copy of the purchase order sent to the contractor. However, Bagala admitted that the secretary is actually the individual who mails the purchase order and appendix to the contractor, and, thus, he had no firsthand knowledge that the appendix was actually sent to Scaffold Builders. Rather, he conceded that he could only assume that the secretary had sent the appendix to Scaffold Builders. Moreover, the C.F. secretary who would have been responsible for actually mailing the purchase order and appendix was not called to testify regarding her recollection as to whether she forwarded the appendix in question to Scaffold Builders.
Given the conflicting testimony of these witnesses, the jury was faced with two permissible views of the evidence, and we cannot find its choice between these views to be clearly wrong. This assignment of error also lacks merit.

NEW TRIAL/JNOV (Assignments of Error Nos. 2, 3 & 10)
After the trial court rendered judgment in accordance with the jury's verdict, C.F. filed a motion for judgment notwithstanding the verdict (JNOV) and, in the alternative, for a new trial. The motion was denied by judgment rendered on April 18, 1994. C.F. now contends that the trial court erred in denying its motion for JNOV and for a new trial.
In ruling on a motion for JNOV under LSA-C.C.P. art. 1811, the trial court is required to employ the following legal standard: A JNOV should be granted only if the trial court, after considering the evidence in the light most favorable to the party opposed to the motion, finds that the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on that issue. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 (La.App. 1st Cir. 3/11/94), 634 So.2d 466, 491-492, writ denied, 94-0906 (La. 6/17/94), 638 So.2d 1094. Thus, a trial court can grant a JNOV only when a jury's verdict is one which reasonable people could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Lilly v. Allstate Insurance Company, 577 So.2d 80, 83 (La. App. 1st Cir.1990), writ denied, 578 So.2d 914 (La.1991). The standard to be applied by the appellate courts in reviewing the grant or denial of a JNOV is whether the trial court's *821 findings in rendering the JNOV were manifestly erroneous. Belle Pass Terminal, Inc., 92-1544, 92-1545, 634 So.2d at 492.
After a thorough review of all of the evidence in the light most favorable to plaintiff, we find that the trial court was not manifestly erroneous in its denial of C.F.'s motion for JNOV.
C.F. further contends that the trial court erred in failing to grant its motion for new trial based on juror misconduct. According to C.F., juror Lisa Moore expressed an obvious aversion to participating in the jury trial process throughout the trial.
Louisiana Code of Civil Procedure article 1972 provides, in pertinent part, that "[a] new trial shall be granted, upon contradictory motion of any party, in the following cases: ... (3) When the jury was bribed or has behaved improperly so that impartial justice has not been done."
In denying C.F.'s motion for new trial on the grounds of juror misconduct, the trial court stated as follows:
It should be noted initially that no factual allegations of general jury misconduct have been made. The sole issue raised by... C.F.... concerned facial expressions[,] gestures and general "body language" of one juror Ms. Lisa Moore.
* * * * * *
As the trial progressed the court noticed that Ms. Moore continued to demonstrate facial expressions. She also evidenced a general restlessness and voiced approval of breaks and lunch hours.
* * * * * *
The court closely observed Ms. Moore during the closing session. She appeared more attentive and less demonstrative than during the earlier sessions. She appeared particularly attentive to the closing instructions on the law and was ultimately chosen as foreperson of the jury.
There is no allegation or any showing by C.F. that Ms. Moore attempted to bribe or otherwise improperly influence the jury. Moreover, the presence on a jury of a highly opinionated person does not constitute "improper behavior" that precludes impartial justice within the meaning of LSA-C.C.P. art. 1972. Theriot v. Theriot, 622 So.2d 257, 259 (La.App. 1st Cir.), writ denied, 629 So.2d 1138 (La.1993). We, therefore, find no error in the trial court's denial of C.F.'s motion for new trial on this basis.
Finally, C.F. contends that its motion for new trial should have been granted because the Mary Carter agreement entered into by plaintiff and Scaffold Builders should be declared void as against public policy and because the trial court refused to advise the jury of all of the terms of the settlement. In addition to the mandatory grounds for the granting of a motion for new trial set forth in LSA-C.C.P. art. 1972, the trial court also has discretion to grant a new trial "in any case if there is good ground therefor." LSA-C.C.P. art. 1973; Bush v. Cannata's Supermarket, Inc., 612 So.2d 794, 797 (La.App. 1st Cir.1992). Because we find no error in the trial court's limited disclosure to the jury concerning the Mary Carter agreement, we likewise find no abuse of discretion in its denial of C.F.'s motion for new trial for refusal to disclose all of the terms to the jury.
Moreover, as noted in our previous discussion with regard to the Mary Carter agreement, C.F. failed to raise the issue of the validity of the agreement at the trial of this matter. C.F. could have presented this issue to the trial court when the settlement agreement was discussed at the beginning of trial. C.F.'s suggestion that it should now be entitled to a new trial so it can present a new issue not previously raised is without merit. Thus, we find no abuse of discretion in the trial court's denial of C.F.'s motion for new trial on all of the grounds set forth by C.F.

ASSESSMENT OF COSTS (Assignment of Error No. 11)
In this assignment of error, C.F. contends that the trial court abused its discretion in assessing all court costs against C.F., inasmuch as plaintiff was assessed with some degree of fault. C.F. asserts that because plaintiff was found at fault, C.F. prevailed to some extent and should only be liable for court costs in the same proportion as its percentage of fault.
The trial court is vested with great discretion to assess costs against any party as it may deem equitable, even against the *822 party who prevails on the merits. LSA-C.C.P. art. 1920; Richard v. Comeaux, 626 So.2d 507, 511 (La.App. 3rd Cir.1993), writ denied, 93-2989 (La. 1/28/94), 630 So.2d 800. However, the general rule is that costs are to be paid by the party cast in judgment. Clark v. Laird, 458 So.2d 639, 644 (La.App. 3rd Cir.1984), writ denied, 462 So.2d 210 (La.1985).
While the trial court, in its discretion, may assess some costs against a prevailing plaintiff who was found to be partially at fault, Underwood v. Dunbar, 628 So.2d 211, 217 (La.App. 2nd Cir.1993), writ denied, 94-0026 (La. 2/25/94), 632 So.2d 767, the trial court may likewise assess all costs against the defendant cast in judgment despite a finding of fault on the part of the plaintiff. See Clark, 458 So.2d at 644. While plaintiff was assessed with some fault under the comparative fault doctrine, he still prevailed against C.F., the party cast in judgment. Thus, we find no abuse of discretion by the trial court in assessing all costs against C.F.

CONCLUSION
For the above and foregoing reasons, the March 8, 1994 judgment in favor of plaintiff and against C.F., and the April 18, 1994 judgment, denying C.F.'s motion for JNOV or, in the alternative, new trial, are affirmed. Costs of this appeal are assessed against C.F.
AFFIRMED.
NOTES
[1] Plaintiff's employer, NDT, filed a petition of intervention to recover worker's compensation benefits and medical expenses paid to plaintiff as a result of this accident. Associated Risk Management Service Co. ("ARMS"), as administrator of the Louisiana Construction and Industry Self-Insurers Fund, was later substituted as intervenor in place of NDT. Plaintiff and ARMS entered into a compromise settlement, which was approved by the court on October 28, 1993.
[2] Hartford also appealed in this matter from the trial court's August 16, 1993 judgment granting summary judgment in favor of C.F. and against Hartford on the contractual indemnity issue. This appeal was lodged separately with this court under docket number CA 94 1180, and the issues raised by Hartford are disposed of in a separate opinion bearing docket number CA 94 1180, also handed down this day. Lowell Stockstill v. C.F. Industries, Inc., 94-1180 (La.App. 1st Cir. 12/15/95). (unpublished opinion).
[3] In its brief to this court, C.F. also argues that its answer was enlarged to include the statutory employer defense by virtue of the testimony of James Yelverton elicited at trial without objection. We disagree. The general rule is that pleadings may be enlarged by evidence adduced without objection when such evidence is not pertinent to any other issue raised by the pleadings and, hence, would have been excluded if objected to timely. Roberson v. Provident House, 576 So.2d 992, 995 (La.1991). However, the testimony of Yelverton upon which C.F. relies, i.e. that Yelverton was qualified to perform nondestructive testing, was clearly admissible as to his qualifications and background, and his specific duties regarding this particular project. Moreover, counsel for Scaffold Builders objected to the testimony as soon as it became apparent that C.F. was attempting to elicit testimony in support of the statutory employer defense, and the trial court excluded any further questioning on that issue.
[4] LSA-C.C. art. 2324(B) provides, in pertinent part, as follows:

If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. (Emphasis added).
[5] LSA-C.C.P. art. 1812(C)(2) provides:

In cases to recover damages for injury, death, or loss, the court may submit to the jury special written questions inquiring as to: ...
(2) If appropriate, whether another person, whether party or not, other than the person suffering injury, death, or loss, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
[6] Inasmuch as reapportionment of NDT's fault by means of the ratio approach effectively yielded the same outcome that the trier of fact presumably would have achieved if instructed to ignore the employer's fault and to quantify only the fault of the plaintiff and third party tortfeasors, Cavalier, 94-1496 at p. 15 n. 13, 657 So.2d at 984 n. 13, we will review the jury's apportionment of fault to plaintiff and C.F. under the manifest error standard, rather than de novo.