WHIPPLE, C.J., concurring in part and dissenting in part.
*740 I respectfully concur in part and dissent in part from the per curiam opinion. I concur in the per curiam opinion insofar as the majority concludes that as to all issues before us for which there is no executable majority, the judgment stands. I likewise concur in the denial of JCG and Continental's peremptory exception of no cause of action and DOTD's peremptory exception of peremption . I further concur in the per curiam opinion's conclusions that there was no manifest error in the jury's finding that JCG breached the subcontract and ABS did not and in the conclusion that JCG and Continental's assignment of error relative to the pay-if-paid clause lacks merit. While I concur in additional respects, which are more fully set forth below, I dissent from the denial of DOTD's peremptory exception of prescription . As to the remaining issues for which there is no executable majority, I likewise disagree with the result of the per curiam opinion inasmuch as it allows the award of penalties and attorney fees assessed against JCG to stand, it further fails to reduce the amount of damages awarded to ABS, and it fails to dismiss ABS's claims against both ABMB Engineers and PSI as prescribed.
JCG & Continental's Peremptory Exception of No Cause of Action
As observed in the per curiam opinion, JCG and Continental's peremptory exception of no cause of action is predicated on the Supreme Court decision in Pierce Foundations, Inc. v. JaRoy Const., Inc., 2015-0785 (La. 5/3/16), 190 So.3d 298 and the assertion that ABS failed to comply with the mandatory requirements of the DOTD-PWA, LSA-R.S. 48:256.3, et seq., and that JCG and Continental are immune from ABS's claims under the DOTD-PWA.
At the outset, I note that JCG and Continental make no claim that they were estopped from making such a legal argument prior to the Pierce decision or that they could not have raised this exception prior to the Supreme Court's ruling in Pierce. Second, to the extent that JCG and Continental are now claiming statutory immunity from liability, which is an affirmative defense,[1] I find such immunity claim was waived. JCG and Continental never raised immunity pursuant to LSA-R.S. 48:256.3(B) as an affirmative defense in the trial court. As this case demonstrates, the "general purpose in requiring that certain defenses be affirmatively pleaded is to give fair notice of the nature of the defense, and thereby prevent a last minute surprise to the plaintiff." Stockstill v. C.F. Indus., Inc., 94-2072 (La. App. 1st Cir. 12/15/95), 665 So.2d 802, 810, writ denied, 96-0149 (La. 3/15/96), 669 So.2d 428. Thus, I find that JCG and Continental failed to preserve their claim of statutory immunity under the DOTD-PWA.
*741 Moreover, to the extent that JCG and Continental rely on Pierce, I do not find that Pierce is dispositive of the claims of ABS in the instant litigation. Pierce involved a public works project governed by the Louisiana Public Works Act, LSA-R.S. 38:2241, et seq. JaRoy Construction, Inc. ("JaRoy") was the general contractor on a project to build a gymnasium for the Jefferson Parish Council. In accordance with LSA-R.S. 38:2241(A)(2), JaRoy obtained a bond with surety from Ohio Casualty Insurance Company ("Ohio Casualty"). JaRoy subcontracted with Pierce Foundations, Inc. ("Pierce") for the installation of pilings. After completing its work and not receiving payment from JaRoy, Pierce instituted a lawsuit against JaRoy within one year of the completion of work. Ohio Casualty was added to the suit a year later. After the bankruptcy of JaRoy, Pierce proceeded solely against Ohio Casualty. Almost two years after suit was filed, the Jefferson Parish Council filed a notice of acceptance of the work into the mortgage records pursuant to LSA-R.S. 38:2241.1(A). However, Pierce never filed a sworn statement of claim in the mortgage records pursuant to LSA-R.S. 38:2242(B). As a result, Ohio Casualty moved for summary judgment and argued that Pierce could not recover from it under LSA-R.S. 38:2247, due to Pierce's failure to file the sworn statement of claim in the mortgage records within 45 days of the filing of the notice of acceptance of the work by the Jefferson Parish Council. Pierce argued that the Public Works Act did not affect its rights to proceed in contract and that the Public Works Act did not contemplate a situation where suit was filed prior to the filing of the notice of acceptance and events provided for in LSA-R.S. 38:2242. The trial court granted the motion in part, ruling that there was no privilege in favor of Pierce, but otherwise permitted the suit to proceed. After a trial, judgment was rendered in favor of Pierce for amounts owed under the subcontract as well as compensation for idle time. On appeal, the Fifth Circuit Court of Appeal reversed the trial court and held that Pierce's failure to comply with the relevant notice provisions of the Public Works Act deprived it of a right of action against Ohio Casualty.
The Supreme Court "granted the writ application to determine whether, under LSA-R.S. 38:2247, the notice and recordation requirements of LSA-R.S. 38:2242(B) are necessary conditions for a claimant's right of action against a bond furnished pursuant to LSA-R.S. 38:2241." Pierce, 190 So.3d at 299. In analyzing the legal issue therein, the Supreme Court observed that the plain language of LSA-R.S. 38:2242(B), which provided that a claimant "may" file a sworn statement of claim, and the language of LSA-R.S. 38:2247, which referred to the recordation "requirements" of section 2242(B) in the context of the time limits for claims of subcontractors, were in conflict. The Court then relied on statutory rules of interpretation to determine the meaning of the statute that best conformed to the purpose of the law. The Supreme Court rejected the Fifth Circuit's reasoning implying that the 1985 amendments to the Public Works Act were intended to overrule the Supreme Court's comment in Honeywell, Inc. v. Jimmie B. Guinn, Inc., 462 So.2d 145, 148 (La. 1985), that an unpaid subcontractor with a direct contractual relationship with the contractor is entitled to sue on the contractor's bond without the need for filing and recording a sworn statement or giving notice to the contractor. In reversing the Fifth Circuit, the Supreme Court stated in Pierce that:
If the legislature had intended La. R.S. 38:2247 to have the effect ascribed to it by the court of appeal, it would have altered the permissive "may" in *742 [LSA-] R.S. 38:2242 to the mandatory "shall." Compare , e.g., [LSA-] R.S. 48:256.5(B) ("Public Contracts of the Department of Transportation and Development," providing: "Any claimant shall , after the maturity of his claim and within forty-five days after the recordation of final acceptance of the work by the [governing authority] ....").
Id. at 304-05 (emphasis in original; footnote omitted).
This is the only mention of the DOTD-PWA in the entire opinion in Pierce. The language of the DOTD-PWA was only referred to therein to show its contrast with the language of the Public Works Act and to support the Supreme Court's rejection of the Fifth Circuit's reasoning, which had indicated that a subcontractor on a DOTD project who has not filed a statement of amount due in accordance with the DOTD-PWA may not be able to assert a claim against the general contractor's surety for unpaid amounts due for work performed under the subcontract. The Supreme Court made no further comments or conclusions with respect to the DOTD-PWA.
Finally and most importantly, the subcontractor in Pierce clearly was a "claimant" as that term is defined in LSA-R.S. 38:2242(A). Pierce, 190 So.3d at 302, fn. 2. The Pierce case involved a suit by a subcontractor to recover sums due for work the subcontractor performed pursuant to the contract against a bond furnished under LSA-R.S. 38:2241 because the sums were not paid by the general contractor. The definition of "claimant" in LSA-R.S. 38:2242(A) is nearly identical to the definition of "claimant" in the DOTD-PWA: both statutes define a claimant as "any person to whom money is due pursuant to a contract with the owner or a contractor or subcontractor for doing work, performing labor, or furnishing materials or supplies for the construction, alteration, or repair of any of any public works ...." LSA-R.S. 48:256.5(A) ; 38:2242(A). However, in the instant suit, all pay applications submitted by ABS to JCG during the pendency of the contract were paid in full,[2] and ABS was not seeking the recovery of unpaid invoices for work done pursuant to the Subcontract with JCG. Accordingly, ABS is not a "claimant" pursuant to LSA-R.S. 48:256.5(A). Because ABS was not a "claimant" as that term is defined in LSA-R.S. 48:256.5(A), the provisions of LSA-R.S. 48:256.5(B)[3] and LSA-R.S. 48:256.3(B)[4] are inapplicable, and the exception *743 of JCG and Continental raising the objection of no cause of action lacks merit. Therefore, I concur in the per curiam 's denial of this exception.
DOTD's Peremptory Exception of Peremption and Prescription
However, as to DOTD's peremptory exception raising the objections of peremption and prescription, I would find merit in DOTD's peremptory exception of prescription in light of this court's recent decision in BellSouth Telecommunications, L.L.C. d/b/a AT & T Louisiana v. A & A Cable Contractors, Inc, and CSRS, Inc., 2016-0803 (La. App. 1st Cir. 5/11/17), 221 So.3d 90, and thus would decline to address DOTD's peremption argument as moot.
As noted in the per curiam opinion, ABS asserted only tort claims against DOTD, who was not added to the suit until after the one-year prescriptive period ran. In order for ABS's claims against DOTD to be considered timely, the prescriptive period must have been interrupted or suspended.
While ABS has alleged that all defendants are solidarily liable,[5] the claims against DOTD sound only in tort.[6] No argument was made by ABS in the memoranda and briefs filed with this court that JCG is a tortfeasor.[7] Moreover, JCG's liability was founded solely on breach of contract in the jury verdict rendered. ABS does not dispute that in this case JCG and DOTD are not joint tortfeasors. Thus, prescription could not be interrupted pursuant to LSA-C.C. art. 2324(C).
Instead, the crucial issue herein is whether JCG and DOTD are solidary obligors, i.e., whether a tortfeasor is a solidary obligor with a contractual obligor under the facts of this case. Louisiana Civil Code article 1794 provides that an "obligation is solidary for the obligors when each obligor is liable for the whole performance. A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee." Moreover, solidarity is never presumed; rather, "[a] solidary obligation arises from a clear expression of the parties' intent or from the law." LSA-C.C. art. 1796. For example, solidarity arises as a matter of law when one conspires with another to commit an intentional or willful *744 act pursuant to LSA-C.C. art. 2324(A), but in this case, there are no allegations of intentional or willful acts by JCG or DOTD.[8] Additionally, there has been no demonstration that there was "a clear expression" of intent by JCG and DOTD to be solidary obligors. LSA-C.C. art. 1796.
In support of the position that DOTD and JCG are solidary obligors (an argument made below by both ABS and St. Paul-Travelers), numerous cases have been cited. However, none of the cited cases address the exact issue now before this court. Moreover, the cases cited are factually distinguishable. For example, some of the cases relied upon involve workers' compensation/statutory employer relationships with third party tortfeasors or uninsured/underinsured motorist obligations,[9] both of which involve special statutory schemes specifically aimed at protecting the injured person.[10] Kelley v. Gen. Ins. Co. of Am., 2014-0180 (La. App. 1st Cir. 12/23/14), 168 So.3d 528, 534-39, writs denied, 2015-0157 (La. 4/10/15), 163 So.3d 814, and 2015-0165 (La. 4/10/15), 163 So.3d 816 (Pettigrew, J., dissenting) (Timely filed suit against plaintiff's uninsured/underinsured motorist carrier interrupted prescription against the tortfeasor and her liability insurer because they were determined to be solidary obligors); Glasgow v. PAR Minerals Corp., 2010-2011 (La. 5/10/11), 70 So.3d 765, 770 (Victory, Guidry, and Clark, JJ., dissenting) (The court held that "whether the source of the obligation was voluntary or not, the fact that an obligation existed to provide workers' compensation benefits meant that for purposes of prescription, the alleged tortfeasor and the employer were solidary obligors," and the timely suit against the statutory employer interrupted prescription against the tortfeasor).
The other cases cited do not address interruption of prescription. Bellard v. Am. Cent. Ins. Co., 2007-1335 (La. 4/18/08), 980 So.2d 654, 663-67 (An employer's uninsured motorist carrier and the employer and/or the employer's worker's compensation insurer were determined to be solidary obligors for purposes of damages); Standard Roofing Co. of New Orleans v. Elliot Const. Co., 535 So.2d 870, 881-882 (La. App. 1st Cir. 1988), writs denied, 537 So.2d 1166 (La. 1989), and 537 So.2d 1167 (La. 1989). In the Standard Roofing case, the court determined that the original obligations of two defendants were several pursuant to LSA-C.C. art. 1787, as each obligor had separate obligations to perform separate acts. However, in reviewing the record on appeal after the trial on the merits, the court found that both obligors' independent breaches combined and caused the same exact item of damage - an unacceptable roof. Each obligor's breach was so severe that, alone, each breach would have required a total replacement of *745 the roof. Thus, the court held the obligation owed was now solidary such that the obligor who paid to replace the roof was entitled to contribution from the other obligor. This case did not involve prescription and was decided before the 1996 amendments to LSA-C.C. arts. 2323 and 2324.
The remaining cited cases were decided before the 1996 amendments to LSA-C.C. arts. 2323 and 2324, which abolished solidary liability for non-intentional joint tortfeasors.[11] Osborne v. Ladner, 96-0863 (La. App. 1st Cir. 2/14/97), 691 So.2d 1245, 1256-57 (The court found solidary liability for damages between seller of home who was liable for damages as a bad faith seller and termite company providing termite inspection report to buyer who was liable for damages for breach of its duty of reasonable care to buyer; the buyer settled with the termite company, and the seller was found to be a solidary obligor with the termite company who was entitled to have the damages awarded to buyer reduced pursuant to LSA-C.C. art. 1803 ; the case was decided before the 1996 amendments to LSA-C.C. arts. 2323 and 2324 and did not involve prescription); Lewing v. Sabine Par. Police Jury, 95-630 (La. App. 3d Cir. 11/2/95), 664 So.2d 598, 600 (In a case decided before the 1996 amendments to LSA-C.C. arts. 2323 and 2324, a contract breacher and tortfeasors were found to be solidary liable for purposes of prescription).
Turning to the instant case, in light of the 1996 amendments to LSA-C.C. art. 2324(B) abolishing solidarity among joint tortfeasors and in the absence of any special statutory provisions similar to the provisions for workers' compensation or uninsured/underinsured motorist obligations that would apply to this case, I find no basis for holding that the timely filed suit against the alleged contract breacher (JCG) interrupted prescription as to the tortfeasor (DOTD) in this case. Instead, I find the cases of Toomer v. A-1 Fence & Patio, Inc., 2008-2197 (La. App. 1st Cir. 10/27/09), 29 So.3d 609, writ denied, 2009-2564 (La. 2/5/10), 27 So.3d 302, and BellSouth, 221 So.3d 90, to be more analogous.
In BellSouth, BellSouth Telecommunications, L.L.C. d/b/a AT & T Louisiana ("BellSouth") contracted with A & A Cable Contractors, Inc. ("A & A") to install underground telephone cables. After discovering that the cables were damaged due to the cables not being installed at the proper depth, BellSouth filed suit against A & A, alleging that A & A breached the contract in failing to install the cables as specified in the contract. In the petition, BellSouth alleged that it discovered the damage less than a year before it filed suit against A & A. Over a year after filing suit against A & A and over two years from the date it discovered the damaged cables, BellSouth amended its petition to add tort claims against CSRS, Inc. ("CSRS"). In the supplemental petition, BellSouth claimed that *746 the defendants were jointly and/or solidarily liable for its damages. CSRS then filed a peremptory exception asserting the objection of prescription since BellSouth asserted only claims in tort against CSRS and had filed suit over a year after the commencement of the prescriptive period. CSRS further contended that the prescriptive period was not interrupted by BellSouth's suit against A & A since CSRS and A & A were neither joint tortfeasors nor solidarily liable. The trial court found that BellSouth's claims against A & A sounded in contract only and that the claims against CSRS sounded only in tort. Accordingly, the trial court concluded that CSRS and A & A could not be joint tortfeasors. The trial court also found that CSRS and A & A were not solidarily bound, and the court sustained the exception of prescription.
On appeal, this court had to determine whether CSRS and A & A were solidarily liable such that the timely filed suit against a contract breacher interrupted prescription against a tortfeasor. Relying on Dumas v. State ex rel. Dept. of Culture, Recreation & Tourism, 02-563 (La. 10/15/02), 828 So.2d 530, 537, this court noted that the 1996 amendments to Louisiana Civil Code Articles 2323 and 2324[12] abolished solidary liability among non-intentional tortfeasors and made each non-intentional tortfeasor liable for his share of fault, stating as follows:
The supreme court in Dumas found the language of Article 2324B to be clear and unambiguous:
It provides that in non-intentional cases, liability for damages caused by two or more persons shall be a joint and divisible obligation. Each joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of that other person. This provision abolishes solidarity among non-intentional tortfeasors, and makes each non-intentional tortfeasor liable only for his share of the fault, which must be quantified pursuant to Article 2323.
Dumas, 828 So.2d at 537 (Emphasis in original) (Footnotes omitted).
Thus, in determining whether liability for damages is a solidary or a joint and divisible obligation, LSA-C.C. art. 2324A provides that "[h]e who conspires with another person to commit an intentional or willful act" is solidarily liable "with that person, for the damage caused by such act." If liability is not solidary, then "liability for damages caused by two or more persons shall be a joint and divisible obligation." LSA-C.C. art. 2324B. See McKenzie [v. Imperial Fire and Cas. Ins. Co. , 12-1648 (La. App. 1 Cir. 7/30/13),] 122 So.3d [42] at 47-48.
*747 BellSouth, 2016-0803, 221 So.3d at 94. Finding no allegations in the petitions to support a determination that CSRS and A & A were solidarily bound, this court concluded that the trial court had correctly sustained the exception of prescription.
In Toomer, a fire destroyed commercial property, and the owner of the property and the lessee of the property sued the lessee's insurer alleging that there was coverage under the policy of insurance for the owner's building and the lessee's contents that were destroyed by the fire. This lawsuit was timely filed, but ultimately dismissed because the owner was not an insured under the policy and the policy did not provide an obligation to the lessee for property damage.
Before the first suit was dismissed, however, the owner filed a separate suit against the lessee and the insurer alleging that the owner's damages were caused by the fault of the lessee (the insured). The same damages sought by the owner in the first suit were sought by the owner in the second suit. The insurer and the lessee filed an exception raising the object of prescription in the second suit, which was granted by the trial court. On appeal, this court noted that the "key factor in this case is whether the first suit was filed against a party who was solidarily liable with the party added as a defendant in the second suit." Toomer, 29 So.3d at 614.
This court observed that in the second suit, the insurer and the lessee were potentially solidarily liable for the negligence claims of the owner.[13] However, in the first suit there was no solidary liability between the insurer and the lessee based on the pure contract claims asserted. In the first suit, the owner asserted that he was an insured under the policy and sought to enforce the insurance contract in that regard, and the lessee also asserted coverage for his losses under the terms of the policy of insurance. As this court noted therein:
[I]n the first suit, the allegations against [the insurer] were such that its potential obligation could only be in favor of a claimant who was an insured under the policy, whereas in the second suit, the allegations are such that its potential liability is to another claimant and is brought on a completely different legal premise.
Id. Ultimately, this court held that there was no solidarity between a defendant in the first suit sued on contract claims and a defendant in the second suit sued on claims of negligence; therefore, prescription as to the second suit was not interrupted by the first, and the claim was prescribed. Thus, as in BellSouth and Toomer, I would conclude that there is no solidarity between the contractually bound obligor, JCG, and the tortfeasor, DOTD, in this case. Accordingly, I would grant the peremptory exception raising the object of prescription , finding that prescription was not interrupted as to DOTD when suit was filed against JCG. For these reasons, I respectfully dissent from the denial of DOTD's peremptory exception raising the objection of prescription.
THE MERITS
Turning to the merits of the appeal raised by the remaining appellants, JCG, Continental, ABMB Engineers and PSI, which are either not addressed or analyzed in this court's per curiam opinion, I would render judgment as follows based on the following rationale.
*748 Prescription of Claims Against Other Appellants
(ABMB Engineers and PSI's Assignment of Error No. I)
ABMB Engineers and PSI assert in their first assignment of error that ABS's claims against them are prescribed for the same reasons advanced by DOTD in support of its peremptory exception of prescription.[14] The suit against JCG and Continental was filed by on March 28, 2006, which was less than a year after ABS left the Project on August 9, 2005. ABMB Engineers and PSI were not added to the suit until November 13, 2007, which was well over two years after ABS left the Project. The claims brought by ABS against ABMB Engineers and PSI are based solely in tort.[15] Unless the one-year prescriptive period for delictual actions pursuant to LSA-C.C. art. 3492 was interrupted or suspended, the claims against ABMB Engineers and PSI are prescribed. ABS counters that ABMB Engineers and PSI are solidary obligors with JCG for the same reasons it argued that DOTD was solidarily bound with JCG and that, accordingly, its claims against these entities are not prescribed.
Similar to the prescription argument raised by DOTD in its exception filed with this court, ABMB Engineers and PSI argue that they are not solidary obligors with JCG such that the timely suit against JCG interrupted prescription as to ABS's claims against them pursuant to LSA-C.C. arts. 1799 and 3503. In light of my dissent from the majority's denial of DOTD's peremptory exception raising the objection of prescription and for the same reasons stated above, I find merit in ABMB Engineers and PSI's first assignment of error,[16] and would dismiss ABS's claims against ABMB Engineers and PSI with prejudice.
Inconsistency of Jury Verdict Form and Judgment
(JCG and Continental's Assignment of Error No. I)
In JCG and Continental's (sometimes hereinafter referred to as "appellants") first assignment of error, they allege that the judgment of the trial court is inconsistent with the jury verdict form. This assignment of error is based on appellants' argument that the trial court's judgment improperly invoked solidary liability among JCG, ABMB Engineers, PSI, and DOTD. Further, appellants argue that the trial court ignored the jury verdict form's instructions, which indicated that *749 the trial court would determine whether the damages awarded in the contract section or the damages awarded in the negligence section applied. Instead of selecting the applicable award based on the law, the trial court incorporated the damages awarded in both sections in its December 1, 2015, judgment by ruling that JCG alone was liable for the whole amount of the damages awarded in the breach of contract section and further ruling that JCG was solidarily liable with each of the tortfeasors (ABMB Engineers, PSI, and DOTD) up to the amount of each tortfeasor's comparative fault. In light of my finding that ABS's tort claims against ABMB Engineers, PSI, and DOTD are prescribed and should be dismissed, I would consider this assignment of error moot.
Other Errors in Jury Verdict Form Precluding Apportionment of Fault
(JCG and Continental's Assignment of Error No. II)
In their second assignment of error, JCG and Continental argue that the trial court erred in refusing to grant a new trial based on irreconcilable errors in the jury verdict form. To the extent that any portion of this assignment of error would not have been rendered moot by my opinion that the claims against ABMB Engineers, PSI, and DOTD are prescribed, I provide the following analysis.
Appellants maintain that the jury should have been allowed to assign fault to all parties involved in the Project regardless of whether the party was previously dismissed by ABS. Appellants further argue that Question 24 on the jury verdict form, which indicated that the trial court would determine which damage section applied, was misleading or confusing.[17] However, there were no objections lodged by appellants with respect to any of the questions in Section III entitled "Negligence" on the jury verdict form, which section included Question 24.[18] Objections to a jury verdict form must be made on the record or else are waived. Autin's Cajun Joint Venture v. Kroger Co., 93-0320 (La. App. 1st Cir. 2/16/94), 637 So.2d 538, 543, writ denied , 94-0674 (La. 4/29/94), 638 So.2d 224. Thus, I am constrained to find that appellants waived any objection they may have had to the "Negligence portion" of the jury verdict form or specifically to Question 24, and I would reject appellants' second assignment of error as meritless.
Challenges to Jury's Factual Finding of Breach of Subcontract (JCG and
Continental's Assignment of Error No. III)
In their third assignment of error, appellants contend that the jury erred in determining that JCG breached the Subcontract and that ABS did not, essentially challenging the jury's underlying factual findings. For the reasons stated herein, I concur in the per curiam opinion in rejecting this assignment of error. In reviewing *750 a jury's findings of fact, an appellate court may not set aside those findings absent manifest error or unless the findings are clearly wrong. Stobart v. State through Department of Transportation & Development, 617 So.2d 880, 882 (La. 1993). In order to reverse a trial court's findings, an appellate court must determine that there exists no reasonable basis for the trial court's factual finding and the record shows the finding is clearly wrong or manifestly erroneous after a review of the record in its entirety. Id."Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." Id. While it is not accurate to state that a trial court's factual findings can never or hardly ever be erroneous, deference should be given to the fact finder. Bonin v. Ferrellgas, Inc., 2003-3024 (La. 7/2/04), 877 So.2d 89, 95. Accordingly, when the evidence supports two permissible views, a fact finder's choice of one of the views cannot be said to be clearly wrong or manifestly erroneous. Id.
In support of their assignment of error, appellants argue that ABS's breach of contract claims are merely: (1) that JCG failed to pay ABS amounts due under the Subcontract at the time ABS left the Project and (2) that ABS was not able to attain its production rate goals as planned. Appellants argue that the claims of non-payment are not supported because there was no additional money due to ABS at the time it left the Project on August 9, 2005. Therefore, they contend JCG was not in breach of its payment obligations.
The testimony presented at trial does show that all pay applications submitted by ABS to JCG prior to the termination of the Subcontract were paid in full.[19] However, a review of ABS's petitions and the evidence presented at trial reveals that ABS did not seek the recovery of unpaid invoices for work done pursuant to the Subcontract with JCG; rather, ABS sought damages from JCG occasioned by JCG's material breaches of the Subcontract, which resulted in damages to ABS. Appellants did not address this important distinction at all in this portion of their arguments in support of this assignment of error.
Appellants' arguments focus on their claim that ABS was bound by the Critical Path Method ("CPM") schedule and that JCG was not bound to ABS's proposed timeline in the Subcontract. Appellants argue that the terms of the Subcontract establish that ABS was bound by the CPM schedule, despite any internal production goals ABS might have had, as the Subcontract between JCG and ABS incorporated all documents of the Prime Contract between JCG and DOTD. Appellants also argue that the Subcontract further provided that ABS would be bound to the same extent as JCG is bound by the Prime Contract insofar as the Prime Contract is applicable to the work of ABS. Further, appellants refer to subsection 1.1 of the General Terms and Conditions of the Subcontract, which, by its terms, required ABS to comply with any time schedule specified by JCG.[20] Appellants also note *751 that, according to the Special Provisions of the Prime Contract, the contractor was required to comply with the special provision entitled "CPM for Construction Progress Scheduling," which provision details the requirements for the CPM schedule required to be submitted by JCG to DOTD. Appellants further contend that, pursuant to all of the contract documents, the CPM schedule controlled ABS's work.
Extensive testimony was elicited at trial from Mr. Bertas, the owner and founder of ABS, regarding the production rate and schedule for ABS's performance of the Subcontract. Mr. Bertas testified that prior to ABS's bid submittals to both JCG and the other general contractor who bid for the Project, ABS met with both contractors. Mr. Bertas indicated that in the meeting with JCG on September 9, 2003, the most important topic discussed was how quickly ABS could construct the MSE walls. He stated that JCG was interested in having the walls built quickly so that JCG could start the bridge work on the Project. Mr. Bertas testified that JCG knew that, if the bridges were built quickly, JCG would increase its chances of getting a performance bonus pursuant to the Prime Contract. According to Mr. Bertas and the Prime Contract, JCG could earn a $10,000.00 per day bonus with a maximum bonus of $900,000.00 if JCG completed the project prior to the expiration of the total contract time.[21]
Also present at the pre-bid meeting with JCG was Richard Brown, the inventor of the Key System 1 MSE wall system used on the Project. Mr. Brown testified that the JCG representatives were very interested in the production rates about which Mr. Bertas spoke to JCG and, further, that JCG wanted Mr. Brown to verify that ABS could guarantee its proposed production rate of 1,700 square feet per day.[22]
Ultimately, ABS's proposed production rate was incorporated into and made part of the Subcontract with JCG as Attachment No. 1 to Exhibit A. The production rate for the construction of the MSE walls was 126 working days over a period of 177 consecutive days, which was based on a fifty-hour work week with five days of work per work week. Item 17 of the Special Provisions of the Subcontract echoed ABS's production rate and provided that "Subcontractor will be required to meet or exceed the following production rate: 300' per day on the leveling pad and 1,700 SF per day on the retaining wall." Using a production rate of 1,700 square feet per day, ABS would complete the 214,200 square feet of wall in 126 days. Mr. Bertas testified that the CPM schedule providing 619 days for the construction of the MSE walls was incongruous with the clear agreement between JCG and ABS to build the MSE walls over a total of 177 days.[23] Using the CPM schedule, ABS's *752 production rate would have been only 346 square feet per day for 214,000 square feet of MSE walls compared with the rate of 1,700 square foot of wall per day actually incorporated into the Subcontract.[24] Mr. Bertas testified that, at the rate used in the CPM schedule, he would have only needed a three-member crew to achieve that production rate as opposed to the twenty-plus crew in ABS's proposal.
JCG's project manager for the Project, Mika McKee Lawson, testified on behalf of JCG regarding the Subcontract. She had a role in negotiating the Subcontract with ABS and also created the CPM schedule. Her testimony was that Mr. Bertas was the one who was insistent on including ABS's proposal in the Subcontract. Mrs. Lawson also testified regarding additional items that were taken into account on the CPM schedule that were not included in ABS's schedule. She testified that JCG had to clear the land in and around the Project and excavate and move dirt in order to prepare the area for the MSE walls. Additionally, there were drainage items that needed to be done and pile driving for a number of pilings needed on the Project.
The testimony of Kenji Hoshino, an expert in CPM analysis and scheduling, was also presented and directly contradicted the testimony of Mrs. Lawson. Mr. Hoshino evaluated and compared JCG's baseline CPM schedule with ABS's schedule for the MSE walls. He opined that the overall sequence of work on the MSE wall planned by ABS and the sequence of work planned by JCG in the CPM schedule were identical, with both schedules contemplating continuous performance. Mr. Hoshino further testified that the only difference between the two schedules was that the JCG schedule had longer durations for all activities, which assumed a much lower productivity than the ABS schedule. Mr. Hoshino addressed Mrs. Lawson's contention that there were items that needed to be completed by JCG prior to ABS's work on the MSE walls began. He stated that those activities, including the drainage items, were scheduled to follow right along with the MSE wall progress.
Mr. Bertas testified that multiple JCG representatives, including Ms. Lawson, informed him that the CPM schedule was manipulated to extend the duration for the construction of the MSE walls beyond the time it would take for ABS to complete the MSE walls in order to achieve the $10,000.00 per day early finish bonus set forth in the Prime Contract. Additionally, Mr. Bertas testified that despite the CPM schedule's extended timeline, he understood from JCG representatives when ABS would start, how long ABS was expected to be on the Project, and how quickly ABS's work would be done.
In light of the evidence and testimony presented, I find that a reasonable basis exists for the jury's finding that ABS's schedule of 126 working days over a period of 177 consecutive days was controlling as between ABS and JCG and that, contrary to JCG's assertions, the schedule was more than a mere internal production goal for ABS. Evidence was presented that JCG
*753 expected ABS to perform its work in accordance with the schedule and sequence in the Subcontract. While it would be reasonable to have the actual duration of ABS's work extend beyond the planned 177 consecutive days due to weather or other typical delays,[25] JCG's extension of the duration of ABS's work from 177 to over 600 days in the CPM schedule was far beyond what was agreed upon by ABS and JCG in the Subcontract. Further, the drastic change in the schedule duration that JCG incorporated into the CPM schedule submitted to DOTD had the effect of preventing ABS from obtaining compensation for actual delays experienced while working on the Project.[26] Moreover, from the perspective of DOTD, JCG and ABS were not delayed; rather, they were on schedule. Accordingly, I find there is a reasonable basis in the record to support the jury's conclusion that JCG breached the Subcontract with ABS, and I find no merit in this portion of JCG and Continental's assignment of error.
Additionally, appellants argue that the jury erred in failing to find that ABS breached the Subcontract. Appellants first argue that ABS failed to adhere to the Project plans and specifications by unilaterally modifying the design of the MSE walls. Appellants maintain that, although the drawings required steel reinforcements (KeyStrips) to be connected on both sides of the block units, ABS bent the key strips in some places and only connected one side of the key strips to the blocks in other places. Appellants argue that while ABS attempted to justify the plan modification, ABS was without authority to do so, as the modification was clearly contrary to the Subcontract.
In support, appellants rely upon subsection 1.3 of the General Terms and Conditions of the Subcontract, which required ABS to complete the work in conformity with the plans and specifications. Appellants also rely on Section 104.06 of the Louisiana Standard Specifications for Road and Bridges, 2000 Edition ("Standard Specifications"), which was incorporated into the Prime Contract and, therefore, the Subcontract.[27]
Section 104.06 provides, in pertinent part, as follows:
During the progress of the work, if subsurface or latent physical conditions are encountered at the site differing materially from those indicated in the contract or if unknown physical conditions of an unusual nature, differing materially from those ordinary encountered and generally recognized as inherent in the work provided for in the contract, are encountered at the site, the party discovering such conditions shall promptly notify the other party in writing of the specific differing site conditions before they are disturbed and before the affected work is performed.
Appellants maintain that ABS was required to submit written requests in connection with the obstruction details of the *754 shop drawings, which were not adequate to address the pilings in the abutment area. Appellants argue that by failing to follow the process, ABS improperly deviated from the plans and specifications. However, I find that the testimony actually reflects that, as contemplated by Section 104.06, the pilings (obstructions) were not unanticipated conditions, and a plan ambiguity is not a differing site condition.
As noted by ABS, the evidence at trial showed that the shop drawings contained errors concerning how the steel reinforcements were to be installed at the abutments. Mr. Brown testified that the shop drawings prepared by Keystone were deficient with respect to the installation around the obstructions. Further, Mr. Brown testified that MSE walls have been and could be designed for single or double pin connections; however, this particular wall was neither designed for a single pin connection nor did the design provide a way for two pin connections to be made around the abutments.[28] Importantly, Mr. Brown testified that, based on his review of ABS's work, he believed that ABS connected the steel reinforcements at the abutments in accordance with the plans or at least as close to the drawings as possible; however, it was simply the plans that were wrong.
Before any issue concerning the steel reinforcements at the abutments was raised in April 2005,[29] ABS had constructed the MSE walls at four of the six abutments. The last two abutments were about halfway or more than halfway finished. Mr. Bertas testified regarding the obstruction detail in the shop drawings and precisely how the detail was interpreted by ABS in order to construct the walls at the abutments. Further, both PSI and DOTD had inspectors on the Project, who inspected the walls at the abutments, all of the connections, and even inspected every piece of steel reinforcement used by ABS. Mr. Bertas testified that ABS built the wall around the abutments to the satisfaction of the inspectors. He stated that "the inspectors would review and look at every connection and make certain that everything was done to their satisfaction before they would allow us to proceed," and that he never received a call from anyone - not JCG nor inspectors from PSI or DOTD - that ABS was building anything incorrectly. Until April 2005, all parties interpreted the shop drawings and plans similarly.[30]
While Dr. Christopher indicated that a single pin connection should have raised an issue to ABS that the design was compromised, Mr. Brown acknowledged that it was possible to have single pin connections in an MSE wall. In weighing the testimony, the jury could have properly concluded *755 that it was not unreasonable for ABS to interpret the plan to permit the single pin connections especially in light of the fact that ABS's work was inspected and approved by the inspectors on site. Furthermore, the record supports a finding that ABS did not improperly deviate from the plans and specifications and that it was reasonable for the jury to conclude that ABS's interpretation of the plans and shop drawings at the abutments were in accordance with the plans or at least as close to the drawings as possible.
Finally, appellants contend that, by abandoning the Project, ABS was the party in breach of the Subcontract. According to appellants, ABS was paid all amounts due and ABS's work was on track with the CPM schedule. According to appellants, shortly after an issue was raised regarding ABS's work, ABS left the Project, which they argue was in breach of the Subcontract. Appellants rely on Section 15 of the General Terms and Conditions of the Subcontract as well as Subsection 22.5 to support their position that ABS was not entitled to stop work during the pendency of a dispute between ABS and JCG.
Section 15, entitled "Claims relating to Contractor," provides as follows:
Subcontractor shall give Contractor written notice of all claims not included in Paragraph 14 [pertaining to claims against the owner/DOTD] within five (5) days of the beginning of the event for which claim is made; otherwise, such claim shall be deemed waived. The pendency of a dispute shall not interfere with the progress of the work by Subcontractor nor limit the right of Contractor to proceed, in good faith, to remedy an alleged default by Subcontractor.
Appellants thus maintain that ABS was not permitted to stop work due to any dispute as to ABS's entitlement to additional compensation.
Subsection 22.5 is found under the Section entitled "Default or Breach" and provides as follows:
Except as limited by this Subcontract, Subcontractor shall have the rights and remedies available at law or in equity for a breach of this Subcontract by Contractor. Any default by Contractor shall be deemed waived unless Subcontractor shall have given Contractor written notice thereof within 7 days after occurrence of such default. Subcontractor shall not be entitled to stop the work or terminate this Subcontract on account of Contractor's failure to pay an amount claimed due hereunder (including changed or extra work) so long as Subcontractor shall not have adequately substantiated the amount due or so long as a good faith dispute exists as to the amount due. Subcontractor shall not be entitled to stop the work on account of a default by Contractor unless such default shall have continued for more than 7 days after the Contractor's receipt of written notice of such default from Subcontractor.
Accordingly, appellants argue that ABS was not entitled to stop its work because JCG failed to pay an amount claimed to be due.
Additionally, appellants contend that ABS agreed that it would not be owed any additional compensation unless the costs were approved and paid by DOTD. I note, however, that appellants have failed to cite to any contract provision in support of this assertion.[31] Appellants also argue that ABS's breach of the Subcontract was not *756 excused by virtue of the fact that ABS could not complete its work as quickly as it had hoped.
ABS counters that Subsection 22.5 of the General Terms and Conditions of the Subcontract permitted ABS to stop work and terminate the contract upon seven days' notice if JCG was in default. ABS notes that it did provide JCG with the requisite notice on July 27, 2005. ABS further points out that, in addition to providing notice of default, the July 27, 2005 letter identified previous notifications sent to JCG for claims which arose during the pendency of the Subcontract as well as previous demands. Thus, on August 5, 2005, ABS demobilized from the site due to JCG's breach and failure to cure, which it was permitted to do under Subsection 22.5.
Having considered the arguments raised by appellants and appellees and the record, I find the record amply supports the jury's finding that JCG breached the Subcontract and that ABS did not breach the Subcontract. Accordingly, I find no manifest error by the trial court in rendering a judgment finding that JCG breached the Subcontract and that ABS did not breach the Subcontract, and I concur in the per curiam opinion in this regard.
Pay-if-Paid Clause
(JCG and Continental's Assignment of Error No. IV)
In their fourth assignment of error, appellants assert that the Subcontract contained a pay-if-paid ("PIP") clause that bars any recovery by ABS. Appellants argue that because JCG was never paid by DOTD for the amounts claimed to be owed by ABS, JCG cannot be liable to ABS for any of ABS's alleged damages. Subsection 2.1 of the General Terms and Conditions of the Subcontract as modified by the Special Provisions provides as follows:
Subject to other provisions hereof, Contractor agrees to pay Subcontractor the stated consideration for said Subcontract Work on the basis and quantities performed, and allowed and paid for by the owner, and to make payment within ten (10) days from the time that Contractor receives payment from Owner, less the same percentage retained by ownerless 5% retainage, which percentage may be retained until completion of the Prime Contract and final estimate is received from Owner. A condition precedent for any payment to Subcontractor shall be receipt by Contractor of payment from Owner. A subcontract estimate shall be provided for each period in which Subcontractor has earnings.
I agree that the PIP clause states that payment by DOTD to JCG is a condition precedent to payment by JCG to ABS. However, I also note that JCG paid ABS for all invoices and pay applications (less the retainage fee pursuant to the Subcontract) that were due at the time ABS left the Project. Moreover, ABS clearly does not seek recovery of unpaid invoices or pay applications for work done pursuant to the Subcontract with JCG that would invoke the application of the PIP clause; rather, ABS sought damages as a result of JCG's breach of the Subcontract. Specifically, ABS's claim was that it incurred losses and damages as a result of JCG's continued breach of the subcontract. Just as the 5% retainage would not be deducted from the payment of damages and losses incurred by ABS as a result of JCG's breach, JCG's obligation to pay for the losses and damages of ABS incurred by JCG's breach is not legally or contractually contingent on JCG receiving payment from DOTD. I would reject JCG's argument otherwise, as I find that the PIP clause is simply not applicable to the claims asserted by ABS.
*757 Thus, I find that appellants' fourth assignment of error also lacks merit, and concur in the majority's rejection of this assignment of error.
Challenges to the Award of a 5% Penalty and Attorney's Fees
(JCG and Continental's Assignment of Error No. VII)
In their seventh assignment of error, appellants argue that the trial court erred in rendering judgment assessing a penalty of 5% plus attorney's fees against JCG in favor of ABS. Appellants argue that the only basis for this award could have been LSA-R.S. 9:2784, but note the statute was not mentioned in the instructions to the jury nor on the jury verdict form. Additionally, appellants argue that ABS never alleged or proved that JCG failed to comply with the statute.
My review of the record reveals that in the original petition and supplemental and amending petitions, ABS requested attorney's fees and all other general and equitable relief. ABS also identified the issue of whether ABS was entitled to recover penalties and attorney's fees from JCG and Continental pursuant to LSA-R.S. 9:2784 as one of its contested issues of law in the Pretrial Order jointly filed by all parties. Although ABS maintains that appellants waived their objection at trial, I find that appellants adequately preserved for review on appeal their objection to the jury verdict form as well as the lack of a special jury instruction with respect to penalties and attorney's fees.
Question 4 on the jury verdict form provided as follows: "Do you find that [JCG] is liable to ABS for penalties and reasonable attorneys' fees in addition to damages that have been awarded?" The form instructed that if jurors answered yes to Question 4, the jury was to then proceed to Question 5, which provided as follows: "What penalty percentage should be awarded to ABS? (Penalty cannot exceed 15%. )." (Italics in original). At trial, the following objection was made:
[Counsel] : ... The second objection for number four is, it gives no direction whatsoever to the jury on the prompt payment statute. The statute only applies if an owner had paid - has paid amounts to a contractor and the contractor has no reasonable cause to pay those amounts to the subcontractor. That's what the statute says. And leaving this open-ended like this gives no guidance ....
This objection was made prior to the case being submitted to the jury and was timely pursuant to LSA-C.C.P. art. 1793.
Louisiana Revised Statute 9:2784, entitled "Late payment by contractors to subcontractors and suppliers; penalties," provides, in pertinent part, as follows:
A. When a contractor receives any payment from the owner for improvements to an immovable after the issuance of a certificate of payment by the architect or engineer, ... the contractor shall promptly pay such monies received to each subcontractor and supplier in proportion to the percentage of work completed prior to the issuance of the certificate of payment by such subcontractor and supplier, ...
* * *
C. If the contractor ... without reasonable cause fails to make any payment to his subcontractors and suppliers within fourteen consecutive days of the receipt of payment from the owner for improvements to an immovable, the contractor or subcontractor shall pay to the subcontractors and suppliers, in addition to the payment, a penalty in the amount of one-half of one percent of the amount due, per day, from the expiration of the period allowed herein for payment after *758 the receipt of payment from the owner. The total penalty shall not exceed fifteen percent of the outstanding balance due. In addition, the contractor ... shall be liable for reasonable attorney fees for the collection of the payments due the subcontractors and suppliers. However, any claim which the court finds to be without merit shall subject the claimant to all reasonable costs and attorney fees for the defense against such claim.
Appellants argue that LSA-R.S. 9:2784 is inapplicable because ABS was paid all amounts due at the time it left the Project. I agree. However, as stated above, ABS did not bring its claim for the failure of JCG to remit payment received from DOTD for invoices from ABS for work done on the Project. Accordingly, just as I find that the PIP Clause is inapplicable to this particular case, so is LSA-R.S. 9:2784.
Additionally, I fully agree with the appellants that the jury was not adequately instructed on the award of penalties. Travis v. Spitale's Bar, Inc., 2012-1366 (La. App. 1st Cir. 8/14/13), 122 So.3d 1118, 1125, writs denied, 2013-2409 (La. 1/10/14), 130 So.3d 327, 2013-2447 (La. 1/10/14), 130 So.3d 329 (a trial court is obligated to provide adequate jury instructions that properly reflect the applicable law). The jury verdict form interrogatory failed to identify the basis of the award and failed to give any guidance or direction to the jury. A trial court is vested with wide discretion in framing the questions presented as special jury interrogatories; notwithstanding, this court has stated as follows:
If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. Bradbury v. Thomas , 1998-1678, p. 19 (La. App. 1st Cir.9/24/99), 757 So.2d 666, 679.
Schram v. Chaisson, 2003-2307 (La. App. 1st Cir. 9/17/04), 888 So.2d 247, 251. Notably, the jury in this case sent the following questions to the trial court regarding Question 5 on the jury verdict form: " What are penalties referring to? How are they calculated?" In response, the trial court instructed the jury to refer to the "jury charges and/or verdict form." However, neither the jury verdict form nor the jury charges provided any information regarding the assessment of penalties.
Accordingly, because I find merit to this assignment of error, I would vacate the portion of the trial court's judgment that ordered JCG to pay substantial and significant penalties to ABS pursuant to LSA-R.S. 9:2784. Therefore, to the extent that the per curiam opinion results in this portion of the trial court's judgment standing, I respectfully dissent.
Loss of Profits and Business
(JCG and Continental's Assignment of Error No. V)
Appellants argue that ABS was not contractually entitled to lost profits or loss of business and, further, that such damages were not sufficiently proven at trial. Appellants argue that ABS failed to establish its loss of business claim of $2,000,000.00 with any evidence or corroborating testimony. With respect to the remaining $1,174,000.00 award of damages for excess costs and lost profits, appellants contend that the award should be reduced further because the Subcontract precluded the recovery of lost profits.
Appellants argue that ABS cannot recover any damages for lost profits because the provisions in the Subcontract and the Prime Contract precluded such recovery. In support, appellants first rely upon one *759 sentence of Subsection 13.2 of the General Terms and Conditions of the Subcontract, which provides that the Subcontractor is not entitled to anticipated profits on work not performed. However, when read in whole, Subsection 13.2 applies "[i]f the Prime Contract is terminated." In this case, the Prime Contract between JCG and DOTD was not terminated. Accordingly, I do not find this provision controlling.
Similarly, Section 108.11 of the Standard Specifications, which was incorporated into the Prime Contract and the Subcontract, is not applicable. Section 108.11, entitled "Termination of Contract," provides for the handling of payment to the contractor when DOTD terminates the contract and states, in part, that no claims for loss of anticipated profits will be considered. However, Section 108.11 does not address, mention, or provide for a situation where the contractor terminates the contract.
Appellants also rely upon Section 105.18 of the Standard Specifications, which provides for claims for additional compensation. This provision sets forth the procedure for seeking additional compensation when "the contractor deems additional compensation is due for work, material, delays, inefficiencies, disruptions or other additional costs/or expenses not covered in the contract or not ordered as extra work." Section 105.18 further provides that payment of these claims is to be made in accordance with Section 109.04, entitled "Compensation for Alterations of the Contract."
Section 109.04 provides, in pertinent part, that the "[p]ayment for work performed in accordance with Subsection 104.02 [alteration of the contract provision] will be made at the unit prices or agreed prices stipulated in the plan change authorizing the work." In this case, ABS is not seeking additional compensation for work not covered in the contract. Rather, ABS is seeking the payment of damages incurred as a result of JCG's breach of contract, which damages include the excess costs incurred by ABS, lost profits on the Project, and the loss and destruction of its business.
Louisiana Civil Code article 1995 provides that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." Accordingly, the cited contract provisions involving how additional compensation should be calculated are not controlling in determining what amount of loss was sustained by ABS as a result of JCG's breach of the Subcontract, and I find that ABS was entitled to seek the profits it was deprived of as a result of JCG's breach of the Subcontract.
Regarding the amount of damages awarded, the jury verdict form only asked, "[h]ow much money would fully and fairly compensate ABS for [JCG's] breach of contract?" The jury's response was the awarding of the lump sum of $3,174,160.00 without any itemization of the elements of damage claimed by ABS (excess costs, lost profits, and loss/destruction of business). The individual elements of a damage award are not required to be itemized on the jury verdict form. See LAD Servs. of Louisiana, L.L.C. v. Superior Derrick Servs., L.L.C., 2013-0163 (La. App. 1st Cir. 11/7/14), 167 So.3d 746, 762-63, writ not considered, 2015-0086 (La. 4/2/15), 162 So.3d 392 (a jury verdict form is not legally deficient simply because the elements of special damages are not itemized); Abrams v. Dinh, 471 So.2d 994, 999-1000 (La. App. 1st Cir. 1985) (the trial court did not abuse its discretion in "submitting a lump sum jury verdict on damages rather than special interrogatories on each element of damages claimed").
Regarding review of lump sum awards:
*760 A lump sum judgment is normally presumed to award all items of damages claimed, and the appellant's burden of proving that the fact finder abused its much discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable. Bryan v. City of New Orleans , 98-1263 (La. 1/20/99), 737 So.2d 696, 697-98. Each case must be determined on its own facts and circumstances, and we must examine each element of damage claimed to determine if there was an abuse of discretion. See Reck [v. Stevens] , 373 So.2d [498,] 501 [ (La. 1979) ].
Johnson v. Henry, 2016-0271 (La. App. 1st Cir. 10/31/16), 206 So.3d 916, 919. Further, the Fourth Circuit Court of Appeal has noted that "where it is possible to break out from the lump sum one or more specific items of damage, and to do so gives a better picture of the adequacy or inadequacy of the award, then it may be done." Taylor v. Tulane Med. Ctr., 98-1967 (La. App. 4th Cir. 11/24/99), 751 So.2d 949, 964. (Citations omitted.)
In this case, ABS claimed excess costs, lost profits, and the loss of its business as a result of the breach of the Subcontract by JCG.[32] Appellants argue that ABS failed to establish its claim by failing to establish a valuation for the loss and/or destruction of its business and further argue that ABS's claim for lost profits should be reduced and limited to $436,584.02, the amount of lost profits sought by ABS in its July 27, 2005 claim letter to JCG prior to demobilizing from the Project on August 9, 2005.
At trial, extensive testimony and evidence was presented to substantiate and to challenge the excess costs incurred and the profits lost by ABS as a result of JCG's breach of the Subcontract. After a foundation was laid for Mr. Bertas' familiarity with the accounting of ABS, Mr. Bertas was asked how he would calculate excess cost and lost profits on the Project. Mr. Bertas testified that he would use the total cost approach. This approach adds the total cost of the Project, which includes overhead, to the amount of net profits that should have been earned on the Project. According to Mr. Bertas' testimony and the evidence presented to the jury, the total cost on the Project was $2,574,907.12. Mr. Bertas' testimony was that the net profits should have been $1,135,029.003[33] on this Project, which is supported by the record.[34] Under this approach, the sum *761 of the total cost and the net profits, $3,709,936.12, is then reduced by $1,969,772.00 - the amount actually paid to ABS by JCG on the Project - in order to determine the excess cost and lost profit. Thus, according to Mr. Bertas and the evidence, ABS's excess costs and lost profits totaled approximately $1,740,164.00.[35] Thus, as to these elements of ABS's claims, I find no error in the jury's award for ABS's excess costs and lost profits.
The remaining item of damage claimed by ABS was the loss/destruction of business. Appellants argue that the record does not support such an award, as ABS relied solely on the testimony of Mr. Bertas, who testified that, as the owner and operator of ABS, he would place a "very, very conservative number of $2 million in the loss of the business," in addition to the excess costs and lost profits. Appellants argue that such testimony was insufficient to support this item of damage. On review, I agree.
While ABS cites to facts and testimony showing that its business was "destroyed" and notes that the independent testimony from Mr. Brown confirmed that ABS forever lost the unique relationship it had with Keystone, such evidence only supports a finding that ABS's business was destroyed. However, there is no evidence in the record on which the jury could reasonably rely establishing the value of the loss of ABS's business. While Mr. Bertas's own general valuation of the loss of the business was $2,000,000.00, there was no testimony to support the valuation and no documentary evidence, expert valuation or otherwise, to support Mr. Bertas' "conservative number" of $2,000,000.00.[36]
This court has held that "the loss of value of the business at the time of the destruction" is the appropriate measure of damages for the destruction of a business.
*762 Achee v. National Tea Co., 95-2556 (La. App. 1st Cir. 12/20/96), 686 So.2d 121, 125. However, in Achee, the plaintiff presented the expert testimony of a certified public accountant regarding the value of the business at issue. Here, ABS relies on the unsupported testimony of its owner that the business was conservatively worth $2,000,000.00 and provides no further explanation or justification for Mr. Bertas' estimate. In this case, ABS bore the burden of establishing the amount of its damages by a preponderance of the evidence and failed to do so. See Santangelo v. Capitol Home Planners, 424 So.2d 1214, 1215 (La. App. 1st Cir. 1982). It is not fatal to a plaintiff's burden that he lacks independent, corroborating evidence; however, "the lack of even a minimal degree of detail or [specificity] in his own testimony as to the extent of the loss precludes an award, even under the holding in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971), relative to the degree of certainty required to support an award of monetary damages." Casadaban v. Bel Chem. & Supply Co., 322 So.2d 854, 859 (La. App. 1st Cir. 1975). See also Messer v. Dep't of Corr., Louisiana State Penitentiary, 385 So.2d 376, 378 (La. App. 1st Cir.), writ refused, 386 So.2d 1379 (La. 1980) ("Although the trial judge has discretion to determine damages in the absence of exact mathematical proof, an absence of a minimal degree of detail or specificity as to the extent of loss precludes an award."); LeBlanc v. Gibbens Pools, Inc., 447 So.2d 1195, 1197 (La. App. 5th Cir.), writ denied, 450 So.2d 958 (La. 1984) ("a minimal degree of detail or specificity is required in fixing damages."); Teen Town Prods., L.L.C. v. Scurlock, 2015-454 (La. App. 5th Cir. 12/23/15), 182 So.3d 1208, 1215-16 (a plaintiff's testimony as to the value of damages can be sufficient when no contradictory evidence is produced, but the testimony must include some amount of detail or specificity regarding value in order to support an award of monetary damages); Platinum City, L.L.C. v. Boudreaux, 2011-559 (La. App. 3d Cir. 11/23/11), 81 So.3d 780, 786 ("plaintiff must allege damages to a certain degree of specificity").
Accordingly, in the absence of any degree of detail or specificity with respect to the value of the destruction of its business, I conclude that the record does not support this portion of the jury's award of damages to ABS.
Pursuant to Johnson, I have examined the facts and circumstances of this case and reviewed each element of damage claimed. While the precise manner in which the jury arrived at the total lump sum damage award to ABS may not be wholly discernable from the record,[37] I am able to conclude that not all of the jury's award is supported from the record. Specifically, the record lacks support for the amount awarded to ABS for its loss/destruction of business claim. Accordingly, I would not maintain this portion of the award, which is the practical effect of the majority's per curiam opinion. However, as illustrated above, the record more than *763 adequately supports the $1,740,164.00 in damages claimed by ABS for the elements of lost profits and excess costs, and I would maintain this portion of ABS's damages. Finding merit, in part, to appellants' argument in this assignment of error, I would amend the judgment to specifically reduce the total amount of damages to ABS from an award of $3,174,160.00 to award the sum of $1,740,164.00.
For the reasons set forth above, I respectfully concur in part and dissent in part.
GUIDRY, J., concurs.
I concur in the per curiam opinion to the extent that it allows the judgment of the trial court to stand and write separately to set forth reasons why the trial court's judgment, except as to the liability of the Louisiana Department of Transportation and Development ("DOTD") and the award of penalties and attorneys' fees against James Construction Group, L.L.C. ("JCG"), should be affirmed.
As to the liability of JCG and its surety, Continental Insurance Company, I concur in overruling their exception raising the objection of no cause of action filed with this court, which asserted that the plaintiff, ABS Services, Inc. ("ABS"), failed to state a cause of action against them because it failed to assert a cause of action pursuant to La. R.S. 48:256.3, et seq. and "there is no evidence of compliance with the requirements of La. R.S. 48:256.5(B) in the trial record." I note that although JCG did not file this objection of no cause of action with the trial court, in one of its pretrial motions, JCG asserted that ABS was not pursuing a claim pursuant to the Public Works Act, but rather was proceeding with contractual and negligence claims. Moreover, DOTD, which was represented by the same counsel as JCG and Continental, raised this issue regarding La. R.S. 48:256.3, et seq. in a pretrial motion for summary judgment. To the extent that this objection of no cause of action seeks to raise an issue that, more properly, should have been raised as an affirmative defense and was not so raised by JCG, I concur in overruling their exception.
In addition, La. R.S. 48:250(A) provides that "[t]his Part shall exclusively govern the contracts of the [DOTD]." JCG and Continental alleged that non-compliance with these statutes precluded an action by ABS against them. The contract at issue herein is between JCG, as general contractor, and ABS, as subcontractor. Listed below are the pertinent statutory provisions.
Louisiana Revised Statutes 48:256.3 provides, in part:
A. (1) Whenever the department enters into a contract in excess of fifty thousand dollars for the construction, maintenance, alteration, or repair of any public works, the department shall require of the contractor a bond with good, solvent, and sufficient surety in a sum not less than fifty percent of the contract price for the payment by the contractor or subcontractor to claimants as defined in R.S. 48:256.5.
* * *
B. The payment provisions of all bonds furnished for department contracts described in this Subpart, regardless of form or content, shall be construed as and deemed statutory bond provisions. . . Sureties and contractors executing payment bonds for department contracts under this Subpart shall be immune from liability for or payment of any claims not required by this Subpart.
Louisiana Revised Statutes 48:256.5 provides, in part:
A. "Claimant", as used in this Chapter, means any person to whom money is due pursuant to a contract with the *764 owner or a contractor or subcontractor for doing work, performing labor , or furnishing materials or supplies for the construction, alteration, or repair of any public works , or for transporting and delivering such materials or supplies to the site of the job by a for-hire carrier, or for furnishing oil, gas, electricity, or other materials or supplies for use in machines used in the construction, alteration, or repair of any public works, including persons to whom money is due for the lease or rental of movable property, used at the site of the immovable and leased to the contractor or subcontractor by written contract, and including registered or certified surveyors or engineers, or licensed architects, or their professional subconsultants, employed by the contractor or subcontractor in connection with the building of any public work. [Emphasis added.]
B. Any claimant shall, after the maturity of his claim and within forty-five days after the recordation of final acceptance of the work by the department or of notice of default of the contractor or subcontractor, record the original sworn statement of the amount due him in the office of the recorder of mortgages for the parish in which the work is done and file a certified copy of the recorded sworn statement of the amount due, showing the recordation data, with the undersecretary of the department.
* * *
D. (1) The department shall withhold from progress payments and the final payment one hundred twenty-five percent of the amount claimed after receipt by the undersecretary of the department at the location specified in the recorded contract of a sworn statement of amount due from a claimant to the extent of payments due and owed the contractor after receipt of said claim.
(2) When the department makes final payment to the contractor without deducting such amounts as required in this Subsection of all outstanding claims so served on it or without obtaining a bond from the contractor to cover the total amount of all outstanding claims, the department shall become liable for the amount of these claims to the extent of its failure to withhold funds as required in this Subsection
Louisiana Revised Statutes 48:256.7 provides, in part:
A. If a statement of claim or privilege is filed, any interested party may deposit with the recorder of mortgages either a bond of a lawful surety company authorized to do business in the state or cash, certified funds, or a federally insured certificate of deposit to guarantee payment of the obligation secured by the privilege or that portion as may be lawfully due together with interest, costs, and attorney fees to which the claimant may be entitled up to a total amount of one hundred twenty-five percent of the principal amount of the claim as asserted in the statement of claim or privilege....
JCG and Continental rely on the Louisiana Supreme Court case of Pierce Foundations, Inc. v. JaRoy Construction, Inc., 15-0785 (La. 5/3/2016), 190 So.3d 298. That case dealt with a claim asserted by a subcontractor against the general contractor in which they were in privity of contract and dealt with the provisions of La. R.S. 38:2242, et seq., which is the Public Works Act, but not the DOTD Public Works Act, which is contained in the statutes cited above and is applicable to DOTD contracts. The Court there held that a claimant's failure to file a sworn statement with the public authority (which was undisputed) did not affect the right of the subcontractor, in contractual privity with the general *765 contractor, to proceed directly against the contractor and its surety, although the subcontractor would lose his privilege against funds in the hands of the public authority. Although at first glance, it may appear that the statutory language at issue herein may mandate that ABS had to record its sworn statement of claim in order to assert a claim herein, the Louisiana Supreme Court, in Pierce, noted:
[T]he [Public Works] Act creates an additional remedy to persons contributing to the construction, alteration, or repair of public works-a "privilege against the unexpended fund in the possession of the authorities with whom the original contract ha[d] been entered into." ... The Act is not intended to-and does not-affect rights between parties proceeding directly in contract and is, in fact, silent on the question of parties that are in contract and, as here, file suit well before the notice of acceptance or default is filed.
Pierce, 15-0785 at pp. 10-11, 190 So.3d at 305 (citations omitted; emphasis in original).
I find that Pierce is not dispositive of this case because it dealt with La. R.S. 38:2242 et seq. and only briefly mentioned La. R.S. 48:256.5 for comparison purposes. Even if La. R.S. 48:256.3, et seq. is applicable herein, ABS asserted a breach of contract claim against JCG pursuant to the contract between the parties, which is not prohibited by these statutory provisions. Moreover, the trial exhibits include a copy of ABS' recorded statement of claim.[1] Accordingly, even if this court were to find that compliance with La. R.S. 48:256.5 was required, there is evidence in the record that such statement was recorded, and jurisprudence provides an exception to the general rule that no evidence should be considered to support an objection of no cause of action when evidence is introduced at trial, which would deem the pleadings to have been enlarged. Snearl v. Mercer, 99-1738, p. 8 (La. App. 1st Cir. 2/16/01), 780 So.2d 563, 572, writs denied, 01-1319, 01-1320 (La. 6/22/01), 794 So.2d 800, 801.
With regard to the liability of JCG, I concur with the per curiam opinion that there was no manifest error by the jury in its findings that JCG breached its contract with ABS and that ABS did not breach the contract. With regard to JCG's assigned error of the applicability of the "pay-if-paid" clause, while I find that there was conflicting evidence as to whether ABS was paid for all invoices and pay applications (less the retainage), I also find that the jury heard the testimony, had the contract before it, and made the factual determination that JCG breached the contract, thereby rejecting this defense. Accordingly, I find no merit to the assigned error regarding the "pay-if-paid" clause.
With regard to the DOTD, it filed, with this court, an exception raising the combined objections of prescription and/or peremption. In addition, two other defendants, ABMB Engineers, Inc. ("ABMB") and Professional Service Industries, Inc. ("PSI"), asserted similar errors regarding prescription. I would overrule the objection of prescription filed by DOTD and reject the assigned error by ABMB and PSI as to prescription, but would sustain the objection of peremption as to DOTD and dismiss ABS' claims against DOTD on that basis.
Both DOTD and ABS agree that the prescriptive period commenced on August *766 9, 2005, the date ABS demobilized from the Project. ABS filed suit against JCG and Continental Insurance Company less than one year later, on March 28, 2006. However, as DOTD was not added to the suit until November 2012, DOTD asserted that prescription against it was not interrupted by the initial suit against JCG. This dispute centers around whether DOTD and JCG were solidary obligors, as the interruption of prescription against one solidary obligor is effective against all solidary obligors. La. C.C. art. 1799. ABS' claim against JCG sounded in contract, while its claim against DOTD sounded in tort. Louisiana Civil Code article 1797 provides that an obligation may be solidary though it derives from a different source for each obligor. Moreover, this court has previously recognized that solidary liability can exist among defendants whose obligations arise from different sources.
In Osborne v. Ladner, 96-0863 (La. App. 1st Cir. 2/14/97), 691 So.2d 1245, the purchasers of a home sued the seller and the extermination company that inspected the home after finding termite damage. Citing La. C.C. art. 1797, this court found that an obligation may be solidary even though the obligations arise from separate acts or by differing reasons. It is the co-extensiveness of the obligations for the same debt, not the source of liability, that determines the solidarity of the obligation. Osborne, 96-0863 at p. 14, 691 So.2d at 1256. This court consequently found the seller, whose obligations arose out of a contract or quasi-contract, and the exterminating company, whose duty arose from an offense or quasi-offense, were solidarily liable for the termite damage. Osborne, 96-0863 at p. 16, 691 So.2d at 1257.
In Bellard v. American Central Insurance Co., 07-1335 (La. 4/18/08), 980 So.2d 654, plaintiff was injured in an automobile accident while in the course and scope of his employment and sued his employer's UM insurer. The case did not concern a prescription issue, but rather it concerned whether the UM insurer was entitled to a credit for workers' compensation benefits paid to plaintiff. In determining that question, the Court discussed the issues and principles governing solidary liability. Bellard, 07-1335 at pp. 10-14, 980 So.2d at 663-66. In finding the UM and workers' compensation insurers were solidarily liable, the Court recognized that "parties may be solidarily liable although their liability is in different amounts," noting that it was error for the court of appeal to require that each obligor must be liable for the entirety of the debt. Bellard, 07-1335 at p. 15, 980 So.2d at 666. The Court held there was an in solido obligation as to every item for which plaintiff could compel payment from either obligor. Bellard, 07-1335 at p. 16, 980 So.2d at 667.
In Glasgow v. PAR Minerals Corporation, 10-2011 (La. 5/10/11), 70 So.3d 765, an injured worker timely sued his statutory employer (subsequently found immune from tort liability), then later amended his action to name other defendants after the prescriptive period. The Court affirmed the principle that, for purposes of prescription, parties are "solidarity liable to the extent that they share coextensive liability to repair certain elements of the same damage." Glasgow, 10-2011 at pp. 12-13, 70 So.3d at 772.
In this case, ABS sought damages that it alleged resulted from the delays in the Project from each of the defendants. Accordingly, I find that solidary liability did exist among each of the tort defendants, DOTD, ABMB and PSI, and the contract defendant, JCG, and the timely filing of the action against JCG interrupted prescription against the other defendants; hence, I find the arguments regarding prescription are without merit.
*767 Nevertheless, La. R.S. 48:251.3, governing contracts of DOTD, provides, in pertinent part:
Any action arising out of or related to a department contract or on the bond furnished by a contractor shall prescribe five years from recordation of the acceptance of such contract or of notice of default of the contractor or other termination of the contract, whichever occurs first.... [Emphasis added.]
The first issue is whether this statute is applicable to ABS' tort claim against DOTD. Although ABS was a subcontractor that contracted directly with JCG, the general contractor, JCG directly contracted with DOTD. I also note that the ABS subcontract specifically incorporated as part of the contract documents for the subcontract "all documents of the Prime Contract." Certainly, the ABS subcontract made it clear that the work was being performed on the Project owned by DOTD and subject to the provisions of the Prime Contract. Accordingly, I find that the tort claim by ABS against DOTD constituted an action related to a DOTD contract.
The question then turns to whether La. R.S. 48:251.3 is prescriptive or peremptive in nature. In the event this statute is prescriptive, DOTD's argument fails for the reasons addressed above, i.e. that prescription was interrupted by the timely filing of the action against JCG. No Louisiana court has addressed whether this statute is prescriptive or peremptive in nature. If found to be peremptive in nature, then the action against DOTD may be perempted, as the final acceptance was issued on April 3, 2007. However, the statute references the date of recordation of the final acceptance, and the copies in the record do not reflect the date of recordation. DOTD argues that this court can take judicial notice of the date of recordation, pursuant to the certified copy of the recorded final acceptance attached to its exception filed with this court.[2] According to that recordation information, the final acceptance was recorded on May 8, 2007. The "Third Supplemental and Amending Petition" filed by ABS, which added the claims against DOTD, was filed on November 5, 2012, more than five years after recordation of the final acceptance.
Although the statute itself uses the term "prescribe," and therefore, some weight should be given to the use of that term, it is not determinative. Rather, it is the legislative purpose sought to be *768 achieved by a particular limitation that is the most significant and determinative factor in distinguishing a peremptive statute from a prescriptive one. State Board of Ethics v. Ourso, 02-1978, p. 7 (La. 4/9/03), 842 So.2d 346, 351. Some weight has been placed on terms that indicate the extinguishment of a cause of action upon the running of a period of time. State Through Division of Administration v. McInnis Brothers Construction, 97-0742, p. 7 (La. 10/21/97), 701 So.2d 937, 942. Another characteristic of a statutorily-created peremptive period is the existence of an underlying public interest that a right exist only for a limited period of time. McInnis Brothers Construction, 97-0742 at p. 6, 701 So.2d at 942. I note that the second sentence of this statute uses the term "extinguished," an indicator of peremption. I further note that this is a matter of public interest. Accordingly, I find that ABS' claims against DOTD are perempted and would grant DOTD's exception based on the objection of peremption, to dismiss ABS' claims against DOTD, with prejudice.
With regard to the award of penalties and attorneys' fees, I find that La. R.S. 9:2784 is not applicable to ABS' claims for damages for delay and/or loss of profits/business, but it may be applicable to the extent there is conflicting testimony as to whether ABS was paid all amounts due for its invoices and pay applications at the time it left the Project. The jury may have reasonably believed the testimony of the owner of ABS, Anthony Bertas, that the final invoice owed to ABS was not paid by JCG. Nevertheless, the jury was clearly not properly instructed as to the applicable law concerning penalties and attorneys' fees, and for this reason, I would vacate this portion of the judgment and remand for a new trial on this issue.
With regard to the amount of damages awarded ABS, considering the totality of the evidence, I cannot find that the jury was clearly wrong in its award of damages herein. The testimony of Mr. Bertas was corroborated, at least in part, which created a permissible view of the damages and provided more than a minimal degree of detail or specificity as to the extent of ABS' damages, which was apparently found reasonable by the jury.
Mr. Bertas testified that prior to this Project, ABS had built over 1,000,000 square feet of Keystone walls and received two "project of the year" awards with the Keystone system. After this Project, Keystone never invited ABS to do another project with Keystone again. This testimony was confirmed by Richard Brown, who was retired from Keystone, but held the patent for the wall system. Mr. Brown testified that Keystone refused to use ABS to quote a job after this Project, and ABS was never invited to be part of the team again. Mr. Brown also testified that ABS was probably Keystone's number one contractor in the country for installing the Key wall system, that ABS was the single most experienced contractor for installing the Key system, and that Keystone promoted ABS and frequently contacted ABS to bid jobs.
Mr. Bertas also testified that before this Project, ABS had a very good growth rate with increasing revenues (although with a few dips). ABS was doing business in 21 states, but at the time of trial, it was working in just one state. Mr. Bertas also testified that he had to lay off employees and sell equipment, and the IRS filed a lien against ABS in the amount of $326,000. ABS introduced into evidence its 2004 and 2005 tax returns. The 2005 (the year ABS left this Project) tax return corroborated Mr. Bertas' testimony regarding the sale of certain assets, including *769 a Ford F250 truck, Dodge 3500 truck, two dozers, a skid loader, a Link Belt and rock drills. Accordingly, I would affirm the jury's award of damages to ABS.
With regard to the allocation of fault on the jury form, while I recognize that La. C.C. art. 2323(B), which states that the provisions of subsection (A) of that article, providing for the determination of the degree of fault of all persons causing or contributing to the injury, death, or loss sued upon, shall apply to any claim for recovery of damages asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability, I would find that such principles are not applicable to JCG, which was held liable herein for breach of contract.
While this court in Petroleum Rental Tools, Inc. v. Hal Oil & Gas Company, Inc., 95-1820, p. 7 (La. App. 1st Cir. 8/22/97), 701 So.2d 213, 217-18, writ dismissed, 97-3088 (La. 2/10/98), 706 So.2d 982, held that a defendant's liability in redhibition qualified as fault under La. C.C. art. 2323, subsequently, this court held differently. In Hoffman v. B & G, Inc., 16-1001, pp. 12-13 (La. App. 1st Cir. 2/21/17), 215 So.3d 273, 282, this court held that a redhibition suit is a contractual action and further held that comparative fault may not be asserted as a defense in an action for redhibition. In addition, the Third Circuit likewise recently found that comparative fault is not applicable to contracts. Justiss Oil Company, Inc. v. Oil Country Tubular Corporation, 15-1148 (La. App. 3d Cir. 4/5/17), 216 So.3d 346, writ denied, 17-0747 (La. 10/9/17), 227 So.3d 830. That case recognized a split in the circuits and that the Louisiana Supreme Court has not ruled squarely on this question. Justiss Oil Company, 15-1148 at p. 14, 216 So.3d at 355. The Third Circuit relied on opinions of Louisiana federal courts, finding the federal courts provided a thorough and well-reasoned analysis of this issue. Justiss Oil Company, 15-1148 at pp. 14, 216 So.3d at 356. See Hanover Insurance Company v. Plaquemines Parish Government, 2015 WL 4167745 (E.D. La. 7/9/15).
In Hanover Insurance Company, the court generally categorized the claims among the approximately thirty parties as: (1) breach of contract claims between the Parish and the parties with which it contracted directly; (2) the Parish's claims against the subcontractors for both negligence and breach of contract; and (3) contribution and indemnity claims between various parties. Hanover Insurance Company, 2015 WL 4167745, at *1. One of the issues before the court was whether comparative fault was available as a defense to a breach of contract claim. The contractors argued that the provisions of La. C.C. art. 2323(B) meant that comparative fault principles applied to all claims, including breach of contract, and the Parish argued that comparative fault was a tort doctrine incompatible with other causes of action. Hanover Insurance Company, 2015 WL 4167745, at *3. The federal court recognized that the Louisiana Supreme Court has long held that civil code articles should be construed with regard to their subject matter. The court noted that La. C.C. art. 2323 is found in Title V of Book III of the Civil Code, dealing with obligations without agreement, and contract law is found in Title IV of Book III, suggesting that Article 2323 was intended to apply to tort law only. . Hanover Insurance Company, 2015 WL 4167745, at *5. The court further noted that Title IV contained specific rules governing calculation of damages in contract cases, and specifically La. C.C. art. 1804, which provides for different allocations of an obligation depending on whether it arises from a contract or an offense or quasi-offense. Hence, the court concluded that the Louisiana Supreme Court *770 would likely hold that La. C.C. art. 2323 applies to tort claims only. Hanover Insurance Company, 2015 WL 4167745, at *6.
Therefore, I would find, at a minimum, that the law in this area is not settled, and accordingly, would be inadequate to support plain and fundamental error sufficient to relax the contemporaneous objection requirement when no party objected to the portions of the jury verdict form pertaining to allocation of fault and damages herein. See Wegener v. Lafayette Insurance Company, 10-0810, p. 14 n.10 (La. 3/15/11), 60 So.3d 1220, 1230 n.10. Additionally, based upon the failure of the parties to object to these portions of the jury verdict form regarding the allocation of fault, I would find this error was waived by the parties.
Accordingly, for the reasons set forth above, I respectfully concur in the per curiam opinion in this matter.

Louisiana Revised Statute 48:256.5(B) provides:
Any claimant shall, after the maturity of his claim and within forty-five days after the recordation of final acceptance of the work by the department or of notice of default of the contractor or subcontractor, record the original sworn statement of the amount due him in the office of the recorder of mortgages for the parish in which the work is done and file a certified copy of the recorded sworn statement of the amount due, showing the recordation data, with the undersecretary of the department.

Louisiana Revised Statute 48:256.3 is entitled "Payment Bond" and provides in subsection (B) as follows:
The payment provisions of all bonds furnished for department contracts described in this Subpart, regardless of form or content, shall be construed as and deemed statutory bond provisions. Any such bond which fails to contain any of the requirements set forth in this Subpart shall be deemed to incorporate all of the requirements set forth in this Section. Language in any such bond containing any obligations beyond the requirements set forth in this Part shall be deemed surplusage and read out of such bond. Sureties and contractors executing payment bonds for department contracts under this Subpart shall be immune from liability for or payment of any claims not required by this Subpart.
(Emphasis added). The Pierce court commented that there was no indication that an immunity provision in the Public Works Act (LSA-R.S. 38:2241(C) ), which this court notes is nearly identical to the immunity provision in the DOTD-PWA (LSA-R.S. 48:256.3(B) ), was intended to replace any of the contractual remedies that a person who also qualifies as a "claimant" under the Public Works Act otherwise possesses. Pierce, 190 So.3d at 306, fn. 6.

See Petition, ¶ 35 (where ABS alleged that Continental is solidarily bound with JCG); Supplemental and Amending Petition, ¶ 53 (where ABS alleged that JCG, Continental, ABMB Engineers, and PSI were solidarily liable); ABS's Second Supplemental and Amending Petition Directed to Defendant's ABMB Engineers and PSI (where ABS alleged that ABMB Engineers, and PSI were solidarily liable with the original defendant, JCG); ABS's Third Supplemental and Amending Petition for Damages, ¶ VIII (where ABS alleged that all defendants, including JCG, Continental, ABMB Engineers, PSI, DOTD, Keystone, Big River, and Premier, were solidarily liable unto ABS).

See ABS's Third Supplemental and Amending Petition for Damages, ¶ III.

In fact, ABS argued that "JCG's liability is, instead, founded on a pure breach of contract," as opposed to redhibition, which has been found to be a hybrid claim sounding both in tort and contract. See Opposition to DOTD's Exceptions of Peremption and Prescription, p. 12.

Notably, in ABS's Supplemental and Amending Petition, ABS alleged that in addition to general acts of negligence, PSI also committed intentional acts that caused harm to ABS. Notwithstanding, there are no allegations that any of the defendants conspired with PSI to commit an intentional or willful act.

While the actual solidary nature of the obligations between an uninsured motorist carrier and a tortfeasor were called into question in the dissenting opinions in Hoefly v. Gov't Employees Ins. Co., 418 So.2d 575 (La. 1982), and the concurrences in Carona v. State Farm Ins. Co., 458 So.2d 1275, 1279 (La. 1984), the prevailing jurisprudence finds solidary obligations in this context.

See Louisiana Workers' Compensation Law, LSA-R.S. 23:1020.1, et seq. and Uninsured Motorist Coverage Law, LSA-R.S. 22:1295 (renumbered from LSA-R.S. 22:680 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009 and redesignated from LSA-R.S. 22:1406(D) by Acts 2003, No. 456, § 3).

See BellSouth, 221 So.3d at 93(citing Dumas v. State ex rel. Dept. of Culture, Recreation and Tourism, 2002-563 (La. 10/15/02), 828 So.2d 530, 537 ). Further, subsection B of LSA-C.C. art. 2324 provides in pertinent part that "[a] joint tortfeasor shall not ... be solidarily liable with any other person for damages attributable to the fault of that person." (Emphasis added). The legislature did not state only that "tortfeasors" shall not be solidary liable with each other; rather, the legislature broadened the prohibition against in solido liability to provide that a tortfeasor shall not be solidarily liable with any other person. It appears that this statutory language has eliminated solidary liability not only between non-intentional joint tortfeasors, but also between a non-intentional tortfeasor and all others, including those whose alleged liability results from contract, absent application of a special statutory provision similar to the provisions for workers' compensation or uninsured/underinsured motorist obligations.

Louisiana Civil Code article 2324 provides as follows:
A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
C. Interruption of prescription against one joint tortfeasor is effective against all joint tortfeasors.

The lessee would be obligated to the owner if found to have negligently caused the fire, and the insurer would be obligated to pay sums that its insured (the lessee) was obligated to pay as damages pursuant to the terms of the policy.

Unlike DOTD, ABMB Engineers previously raised the objection of prescription in the trial court below through peremptory exceptions filed in response to the claims of ABS. Further, ABMB Engineers and PSI filed a joint motion for summary judgment seeking to dismiss the claims of ABS on the basis that the claims were prescribed. The exceptions and motion for summary judgment were denied by the trial court. Accordingly, ABMB Engineers and PSI assigned as error the trial court's failure to dismiss the claims of ABS against them as prescribed.

ABS did assert in its Supplemental and Amending Petition and its Second Supplemental and Amending Petition that it was a third party beneficiary to the contracts that ABMB Engineers and PSI had with JCG, DOTD, and others. However, ABS abandoned these third party beneficiary claims prior to trial by not including the claims in the pretrial order and not presenting those claims at trial. Also, the jury did not make any finding with respect to ABS's third party beneficiary status. Further, in the briefs filed with this court, ABS does not contend that it was a third party beneficiary as to either ABMB Engineers or PSI's contracts.

Because I find merit in ABMB Engineers and PSI's first assignment of error, I would not address ABMB Engineers and PSI's remaining assignments of error.

Question 24 asked what amount of money would compensate ABS for the total negligence of the parties found to be negligent in Question 23, which also told the jury that any amount awarded to ABS in Question 3 (damages for breach of contract) would not be added to the amount listed in Question 24. The jury was told that the court "will determine which of the two awards applies to this case based on the law."

Appellants objected to: Question 4, regarding attorney's fees and the lack of instruction to the jury on the application of the prompt payment statute (LSA-R.S. 9:2784 ); Question 9, regarding whether ABS defaulted on the Subcontract, which appeared to be a duplicate question; and Questions 10, 11 and 13, pertaining to JCG's claims against St. Paul-Travelers.

See footnote 2 supra.

Section 1.1 of Subcontract Agreement, Subcontract No. 10263.S012 between JCG and ABS is found in the section entitled "Progress and Completion" and provides as follows:
Unless herein otherwise specially provided, Subcontractor shall commence the Subcontract Work promptly or upon notice from Contractor. Subcontractor shall prosecute the Subcontract Work diligently to avoid delaying progress of Contractor or other contractors on other portions of the project work and to comply with any time schedule specified by Contractor.
This provision does not require that a subcontractor slow down the progress of its work; rather, this provision seems to instruct a subcontractor to work in an expeditious manner so as to move the project along. Appellants' reliance on only part of the last sentence in this provision to imply that ABS was required to follow a substantially slower production schedule appears to be misplaced.

The initial total contract time in the Prime Contract was 833 days.

Mr. Brown's testimony was that bids of 2,000 square feet of wall per day were routinely made for long walls like those used on this Project.

Subsection 27.1 of the General Terms and Conditions of the Subcontract provides that the Subcontract and the Prime Contract Documents were intended to complement and supplement each other and were to be interpreted as such when possible. It further provides that "[i]f, however, any provision of this Subcontract conflicts with a provision of the Prime Contract, the provision imposing the greater duty on the Subcontractor shall govern."

Further supporting the importance of ABS's production rate and schedule to JCG, JCG placed a purchase order with Premier for MSE wall materials with an incorporated daily usage rate of 1,000 to 3,000 units (blocks which measured one square foot of wall space each), which corresponded to ABS's production rate in the Subcontract.

Mr. Hoshino testified that if the actual delays associated with weather and other incidental issues were factored into the equation, the duration of ABS's work would have been 210 days.

There was testimony and evidence in the record that DOTD stopped production on portions of the MSE wall and artificially delayed the approval of the shop drawings and materials on the Project in order to allow DOTD time to develop a solution to the soil conditions beneath the MSE wall.

The Subcontract between JCG and ABS incorporated all documents of the Prime Contract between JCG and DOTD and provided that ABS would be bound to the same extent as JCG is bound by the Prime Contract insofar as the Prime Contract is applicable to the work of ABS.

Dr. Barry Christopher, an expert in MSE walls and geotechnical engineering, candidly testified that the plans ABS was supposed to follow were, essentially, not constructible, which was a design issue not involving ABS.

The issue arose after Dr. Christopher first visited the Project site with a class he was teaching in Baton Rouge in April 2005. After his site visit, Dr. Christopher contacted DOTD about his concerns regarding the MSE wall, including the abutment issue. Ultimately, he was hired by DOTD to fully review the walls and how they were constructed in addition to reviewing the issues with the soil.

Michael Bennett was one of the inspectors for DOTD. By stipulation, JCG called Mr. Bennett as a witness through his deposition testimony, and the trial judge allowed the jury to take the deposition transcript into the jury room. No other testimony was presented from any other inspector on the Project. Mr. Bennett testified that he did not have any special certifications or training for inspections and had never encountered retaining walls like the MSE walls on the Project which used metal strips. His testimony did not contradict Mr. Bertas' testimony.

Appellants appear to be relying on Subsection 2.1 of the General Terms and Conditions of the Subcontract, i.e., the pay-if-paid clause, the applicability of which is addressed in my discussion of appellants' fourth assignment of error.

I note that the initial burden of establishing each and every element of damage claimed rested with ABS. Epps v. City of Baton Rouge, 604 So.2d 1336, 1347 (La. App. 1st Cir. 1992).

Mr. Bertas testified that the original proposal made by ABS to JCG totaled $8.1 million, which proposal provided that ABS would be providing all of the materials for the Project. The original proposal included all of the costs for the materials, historical costs, and then a markup added for gross profit, which Mr. Bertas testified was approximately $1,555,000.00. According to Mr. Bertas, the net profit on the Project was anticipated to be $1,135,000.00, which amount factored in operating costs of approximately $70,000 per month for the estimated six months that ABS expected to be on the Project. Mr. Bertas further testified that ABS and JCG later agreed to remove nearly all costs for materials from the original proposal, which had the effect of reducing the total Subcontract price as well and, more importantly, reducing the price for the required performance and payment bond. Also, Mr. Bertas stated that while ABS agreed to remove all costs for material from the Subcontract, the anticipated net profit of $1,135,000.00 was not going to change.

As further support for the conclusion that a reasonable basis exists in the record to support the estimate for the $1,135,029.00 in net profits on the Project, Mr. Bertas testified that in 2004, the same year ABS started the Project and should have completed the Project, ABS was projected to have a net profit of $1,282,000.00, which amount was shown on a 2004 Projected Income/Revenue Statement. However, as Mr. Bertas testified and as shown by ABS's 2004 Corporate Tax Return, ABS lost $591,303.00 in 2004, which, when combined with the projected net profit of $1,282,000.00 that did not materialize, resulted in an ultimate loss of over $1.8 million for 2004. ABS's 2005 Corporate Tax Return reflected a loss of $882,187.00, of which Mr. Bertas testified approximately $780,000.00 was attributable to the project, with about $100,000.00 of the loss in 2005 attributable to a separate Project. Moreover, Rodney Tompkins, a construction consultant who was called as a witness for both ABS and St. Paul-Travelers, testified that the value of the inefficiency claim alone was $801,031.12 using the measured-mile approach, which amount did not include lost profits or overhead.

On review of the reasonableness of and support in the record for this award, I note that the testimony and evidence showed that as of July 27, 2005, ABS's damages for its excess costs and lost profits due to the breach of the Subcontract by JCG was, at a minimum, $1,680,622.70. This $1,680,622.70 damage claim was presented to JCG by ABS prior to the demobilization in August of 2005, and Mr. Bertas testified that the damages incurred by ABS were continuing to increase as ABS continued on the Project, Moreover, this was the same damage claim JCG presented to the DOTD on behalf of ABS in its September 28, 2005 claim letter.

While ABS attempted to introduce an exhibit which purported to show ABS's annual revenue per year from 1994-2004, appellants objected to the exhibit due to the fact that the document was a summary and none of the supporting documents used to compile the summary were introduced. This objection was sustained. There was also an attempt to have Mr. Bertas testify regarding a possible sale of ABS in 1998; however, appellants objected to the testimony as hearsay and speculation, which objections were also sustained. No proffer of the aforementioned evidence was made, nor was there any further attempt to substantiate the value of ABS's loss of business.

In determining the precise basis of the jury's award, I note that Mr. Bertas clearly testified that ABS's excess costs and lost profits on the Project were $1,740,164.00 using the total cost approach. Mr. Bertas then testified that the loss of his business was estimated at $2,000,000.00. Immediately thereafter and at the close of the direct examination of Mr. Bertas, counsel for ABS wrote "$3,174,160" for the jury to see and asked Mr. Bertas if that amount was the total amount of damages ABS was seeking; however, an objection was raised (leading) and sustained. The question was rephrased, and Mr. Bertas was asked his final direct question: "What's the total amount of damages that ABS was asking for in this case?" In response, Bertas stated, "$3,174,000.00," which is the sum the jury awarded ABS.

This court adopted the five factor analysis utilized by the Goodwin court in Kinney v. Bourgeois, 2006-2384 (La. App. 1 Cir. 9/14/07), 2007 WL 2686113, (unpublished), writ denied, 2007-2026 (La. 1/7/08), 973 So.2d 730. See Chauvin v. Chauvin, 2010-1055 (La. App. 1 Cir. 10/29/10), 49 So.3d 565, 570 n.3.

Louisiana Code of Evidence article 201(B) provides that a judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Subsection (D) provides that a court shall take judicial notice upon request if supplied with the information necessary for the court to determine that there is no reasonable dispute as to the fact. Subsection (F) provides that a party may request judicial notice at any stage of the proceeding.
ABS filed an opposition to the DOTD's exception raising the objections of prescription and peremption, but did not object or contest therein to consideration of the date the final acceptance was recorded, which is a matter of public record. This court has held that matters of public record may be the subject of judicial notice. See Louisiana Public Facilities Authority v. All Taxpayers, Property Owners, Citizens of State of Louisiana and Nonresidents Owning Property or Subject to Taxation Therein, 03-2738, p. 10 (La. App. 1st Cir. 12/23/03), 868 So.2d 124, 131, writ denied, 04-0213 (La. 3/11/04), 869 So.2d 801 (holding that "[i]n examining the intent of the legislature, a court may take judicial notice of the journals of the houses of the state legislature, as well as records of legislative committee proceedings, where preserved, as they are a matter of public record"). Accordingly, I find this court can take judicial notice of the date that the final acceptance was recorded in the public records.